# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 7, 2011 Session

## NORMAN REDWING v. CATHOLIC BISHOP FOR THE DIOCESE OF MEMPHIS

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Shelby County**
**No. CT-005052-08      D'Army Bailey, Judge**

---

**No. W2009-00986-SC-R11-CV - Filed February 27, 2012**

---

This appeal involves a dispute regarding the civil liability of the Catholic Diocese of Memphis for acts of child sexual abuse allegedly perpetrated by one of its priests in the 1970s. A victim of this alleged abuse filed suit against the Bishop of the Catholic Diocese of Memphis in the Circuit Court for Shelby County seeking monetary damages. The Diocese moved to dismiss the complaint, arguing that the ecclesiastical abstention doctrine deprived state courts of subject matter jurisdiction and that the victim's claims were barred by the statute of limitations. The trial court denied the Diocese's motion. The Court of Appeals held that the statute of limitations had run on the victim's claims and that the ecclesiastical abstention doctrine barred state courts from considering the victim's negligent hiring and retention claims but not the negligent supervision claims. *Redwing v. Catholic Bishop for Diocese of Memphis*, No. W2009-00986-COA-R10-CV, 2010 WL 2106222 (Tenn. Ct. App. May 27, 2010). We granted the victim's Tenn. R. App. P. 11 application for permission to appeal. We have concluded that the Court of Appeals erred by concluding that the state courts lack subject matter jurisdiction over the victim's claims and that the victim's claims are barred by the statute of limitations.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Gary K. Smith and Karen M. Campbell, Memphis, Tennessee, for the appellant, Norman Redwing.

John H. Dotson and Casey Shannon, Memphis, Tennessee, for the appellee, Catholic Bishop for the Diocese of Memphis.

# OPINION

## I.

The facts in this opinion are drawn from the allegations in the complaint. No trial has occurred. Neither party has presented evidence, and no facts have been found by a fact-finder. Because this case comes to us as an appeal from a denial of a motion to dismiss, the applicable standard of review requires us to presume that the allegations in the complaint are true. Our decision to include in this opinion any particular factual allegation found in the complaint should not be construed as a conclusive finding-of-fact that prevents the parties from presenting evidence regarding the fact or that prevents the trial court or the jury from making contradictory findings-of-fact based on the evidence actually presented by the parties.

Norman Redwing[1] was born in August 1960 and was raised in a Roman Catholic home. His childhood was turbulent. He was raped by an adult male when he was seven years old. The trauma remained long after the event, and by the time he was twelve, Mr. Redwing began to run away from home on a regular basis.

Between 1972 and 1974, Mr. Redwing attended mass regularly at Holy Names Catholic Church in Memphis. There he came to know Father Milton Guthrie. On the occasions when Mr. Redwing ran away from home, Fr. Guthrie allowed him to stay at the church. These acts of kindness caused Mr. Redwing to admire and respect priests in general and Fr. Guthrie in particular. Mr. Redwing respected Fr. Guthrie not only for his acts of kindness but also for his involvement in the civil rights movement.

Eventually, Mr. Redwing confided to Fr. Guthrie that he had been raped when he was seven years old. At first, Fr. Guthrie responded with kindness and understanding. He made breakfast for Mr. Redwing when he spent the night at the church and gave him pocket money from time to time. However, after a time, Mr. Redwing alleges that Fr. Guthrie began to take advantage of him. He states that Fr. Guthrie began to touch him in inappropriate ways and eventually inveigled him into a physical relationship that included oral sex.

In August 2008, over thirty years after the alleged acts of sexual abuse occurred, Mr. Redwing filed suit in the Circuit Court for Shelby County against the "Catholic Bishop for

---

[1]Mr. Redwing, who is an adult, has elected to proceed under his name rather than as a pseudonym. We abide by this decision and refer to Mr. Redwing using his proper name rather than an anonymity-preserving designation.

the Diocese of Memphis."[2]  He did not name Fr. Guthrie as a defendant based on his understanding that Fr. Guthrie had died.

Mr. Redwing alleged that the Diocese breached its fiduciary duties and acted negligently with regard to the hiring, retention, and supervision of Fr. Guthrie.  Mr. Redwing also alleged that the Diocese was aware or should have been aware that Fr. Guthrie was "a dangerous sexual predator with a depraved sexual interest in young boys" and that the Diocese misled him and his family regarding its "knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors."  According to Mr. Redwing's complaint, "[a]fter finding out about Father Guthrie's abuse of minors, the Diocese actively took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits."

The Diocese denied the allegations in Mr. Redwing's complaint.  On October 22, 2008, the Diocese filed a Tenn. R. Civ. P. 12.02 motion seeking dismissal of the complaint on two grounds.  First, in accordance with Tenn. R. Civ. P. 12.02(1), the Diocese asserted that the complaint should be dismissed for lack of subject matter jurisdiction based on the ecclesiastical abstention or church autonomy doctrine.[3]  Second, in accordance with Tenn. R. Civ. P. 12.02(6), the Diocese argued that the statute of limitations barred Mr. Redwing's complaint.  The Diocese noted that three decades had passed since the alleged abuse occurred and that nearly three decades had passed since the expiration of the statute of limitations. The Diocese also asserted that neither the discovery rule, fraudulent concealment, nor equitable estoppel could be used to toll the running of the statute of limitations.

---

[2]Mr. Redwing's amended complaint identifies the defendant as follows: "Defendant CATHOLIC BISHOP FOR THE DIOCESE OF MEMPHIS, a corporation sole, (the "Diocese") is a religious organization responsible for the interests of the Roman Catholic Church in Western Tennessee."  Based on this statement, we will refer to the defendant in this case as the "Diocese."

[3]The ecclesiastical abstention doctrine is also known as the church autonomy doctrine.  *See Two Rivers Baptist Church v. Sutton,* No. M2008-01730-COA-R3-CV, 2010 WL 2025444, at *4 (Tenn. Ct. App. May 20, 2010) (quoting *Anderson v. Watchtower Bible and Tract Soc'y of N.Y., Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *4 (Tenn. Ct. App. Jan. 19, 2007)).  The origin of the term church autonomy doctrine as a substitute for the ecclesiastical abstention doctrine has been attributed to a 1981 law review article by Professor Douglas Laycock.  Robert Joseph Renaud & Lael Daniel Weinberger, *Spheres of Sovereignty: Church Autonomy Doctrine and the Theological Heritage of the Separation of Church and State*, 35 N. Ky. L. Rev. 67, 88 (2008); *see* Chad Olsen, Comment, *In the Twenty-First Century's Marketplace of Ideas, Will Religious Speech Continue to Be Welcome?: Religious Speech as Grounds for Defamation*, 37 Tex. Tech L. Rev. 497, 506 n.98 (2005).  For the purpose of this opinion, we will refer to this doctrine as the "ecclesiastical abstention doctrine."

On April 15, 2009, Mr. Redwing filed a memorandum in opposition to the Diocese's motion to dismiss. He argued that the ecclesiastical abstention doctrine did not prevent the state courts from exercising jurisdiction over his complaint. He also asserted that appropriate grounds exist for tolling the statute of limitations, including fraudulent concealment, equitable estoppel, and the discovery rule.

The trial court conducted hearings on the Diocese's motion on April 17 and 20, 2009. On April 22, 2009, the trial court filed an order denying the motion. The court did not explain its reasoning with regard to the ecclesiastical abstention doctrine. With regard to the statute of limitations, the trial court stated that "the record does not establish as a matter of law that sufficient facts as to defendant's potential liability could have been known more than a year prior to the filing of the lawsuit."

Two days after the entry of the trial court's order, the Diocese filed motions seeking permission to pursue an interlocutory appeal pursuant to Tenn. R. App. P. 9 and to stay the proceedings pending the interlocutory appeal. Mr. Redwing opposed both motions. On May 13, 2009, the trial court filed an order declining to approve an interlocutory appeal or a stay.

Pursuant to Tennessee Rule of Appellate Procedure 10, the Diocese immediately filed an application for an extraordinary appeal to the Court of Appeals. On May 14, 2009, the Court of Appeals directed Mr. Redwing to file a response. Mr. Redwing did so. On July 1, 2009, the Court of Appeals granted the Diocese's Rule 10 application for permission to appeal and stayed the proceedings in the trial court pending the appeal.

On May 27, 2010, the Court of Appeals handed down *Redwing v. Catholic Bishop for Diocese of Memphis*, No. W2009-00986-COA-R10-CV, 2010 WL 2106222 (Tenn. Ct. App. May 27, 2010). With regard to the Diocese's defense predicated on the ecclesiastical abstention doctrine, the court drew a distinction between Mr. Redwing's negligent supervision claim and his negligent hiring and retention claims and held unanimously that the latter claims were barred by the ecclesiastical abstention doctrine but that the former claim was not. The Court of Appeals did not separately address Mr. Redwing's breach of fiduciary duty claim.

The Court of Appeals split, however, with regard to the Bishop's statute of limitations defense. The majority of the panel concluded that Mr. Redwing was on inquiry notice when he reached the age of majority because he knew he had been abused, he knew who his abuser was, and he knew that his abuser was employed by the Diocese. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *7. The majority decided that Mr. Redwing's "conclusory allegation that he exercised reasonable care and diligence is not sufficient to prevent dismissal of the complaint as time-barred [because] the rest of the complaint belies the allegation." *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222,

at *7. In the majority's view, if Mr. Redwing had filed suit when he reached eighteen years of age, "discovery in that case would have 'provided a mechanism for [him] to learn that the Diocese had been negligent.'" *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *7 (quoting *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 730 (Tenn. Ct. App. 2008)).

In her dissenting opinion, Judge Kirby concluded that the majority's dismissal of Mr. Redwing's claims was premature in the context of an appeal of a motion to dismiss. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *10. Judge Kirby noted that Mr. Redwing had alleged in his complaint that the Diocese had undertaken to conceal its wrongdoing and that the Diocese had misled Mr. Redwing. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *8. Judge Kirby also concluded that Mr. Redwing was not on inquiry notice with regard to the Diocese's wrongdoing and that even if Mr. Redwing had promptly filed a lawsuit that he likely would not have discovered the Diocese's involvement. *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *9.

Mr. Redwing filed a Tenn. R. App. P. 11 application for permission to appeal on July 26, 2010. We granted his application on December 7, 2010. Mr. Redwing insists that the trial court possesses subject matter jurisdiction to adjudicate his breach of fiduciary duty claim, as well as his claims for negligent hiring, supervision, and retention. He also insists that the Court of Appeals erred by holding that his claims were time-barred. For its part, the Diocese asserts that the trial court lacks subject matter jurisdiction over any of Mr. Redwing's claims and that the Court of Appeals correctly found that Mr. Redwing's claims were barred by the statute of limitations.

Accordingly, this case squarely presents two issues. The first issue is whether, pursuant to the ecclesiastical abstention doctrine, Tennessee's courts should decline to adjudicate Mr. Redwing's claims for breach of fiduciary duty and for negligent hiring, supervision, and retention against the Diocese. If Tennessee's courts possess subject matter jurisdiction to adjudicate all or any of these claims, the second issue is whether Mr. Redwing's claims are barred by the statute of limitations.

## II.

We turn first to the Diocese's facial challenge to the subject matter jurisdiction of Tennessee's courts to adjudicate Mr. Redwing's claims. The Diocese asserts that the ecclesiastical abstention doctrine requires state courts to refrain from adjudicating issues involving theological or spiritual judgment or the internal governance of religious institutions. Mr. Redwing responds that this Court should not permit the Diocese to use the ecclesiastical abstention doctrine to "avoid accountability for the particularly egregious

breach of trust of sexual abuse by clergy" and that adjudicating his claims will not require the courts to become excessively entangled in religious doctrine. While the correct path between the secular and the religious is narrow, we have determined that Tennessee's courts may adjudicate Mr. Redwing's claims without straying into areas that are properly within the Diocese's exclusive domain.

## A.

A motion to dismiss for lack of subject matter jurisdiction falls within the purview of Tenn. R. Civ. P. 12.02(1). Challenges to a court's subject matter jurisdiction call into question the court's "lawful authority to adjudicate a controversy brought before it," *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000), and, therefore, should be viewed as a threshold inquiry. *Schmidt v. Catholic Diocese of Biloxi*, 2008-CA-00416-SCT (¶ 13), 18 So. 3d 814, 821 (Miss. 2009). Whenever subject matter jurisdiction is challenged, the burden is on the plaintiff to demonstrate that the court has jurisdiction to adjudicate the claim. *See Staats v. McKinnon*, 206 S.W.3d 532, 543 (Tenn. Ct. App. 2006); 1 Lawrence A. Pivnick, *Tennessee Circuit Court Practice* § 3:2 (2011 ed.) ("Pivnick").[4]

Litigants may take issue with a court's subject matter jurisdiction using either a facial challenge or a factual challenge. *See*, *e.g.*, *Schutte v. Johnson*, 337 S.W.3d 767, 769-70 (Tenn. Ct. App. 2010); *Staats v. McKinnon*, 206 S.W.3d at 542.[5] A facial challenge is a challenge to the complaint itself. *See Schutte v. Johnson*, 337 S.W.3d at 769. Thus, when a defendant asserts a facial challenge to a court's subject matter jurisdiction, the factual allegations in the plaintiff's complaint are presumed to be true. *See*, *e.g.*, *Staats v. McKinnon*, 206 S.W.3d at 542-43.

Alternatively, "[a] factual challenge denies that the court actually has subject matter jurisdiction as a matter of fact even though the complaint alleges facts tending to show

---

[4]Federal courts construing Fed. R. Civ. P. 12(b)(2) likewise place the burden of persuasion on the plaintiff when subject matter jurisdiction is challenged. *See, e.g.*, *Morrison v. Nat'l Austl. Bank*, 547 F.3d 167, 170 (2nd Cir. 2008). The Tennessee Rules of Civil Procedure are largely modeled on the Federal Rules of Civil Procedure. *See Thomas v. Oldfield*, 279 S.W.3d 259, 262 (Tenn. 2009). While the federal courts' construction of federal rules analogous to our own is not binding on us, *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 430 (Tenn. 2011) (quoting *Harris v. Chern*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000)), we may, and often do, look to the federal courts' interpretation of comparable federal rules for guidance. *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 643 n.3 (Tenn. 2009); *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001); *Harris v. Chern*, 33 S.W.3d at 745 n.2.

[5]Federal courts likewise distinguish between facial challenges and factual challenges to subject matter jurisdiction. 2 James Wm. Moore et al., *Moore's Federal Practice and Procedure* § 12.30[4], at 12-45 (3d ed. 2009).

jurisdiction." *Staats v. McKinnon*, 206 S.W.3d at 543. Thus, the factual challenge "attacks the facts serving as the basis for jurisdiction." *Schutte v. Johnson*, 337 S.W.3d at 770.[6]

For the purposes of its motion to dismiss, the Diocese accepted the facts contained in Mr. Redwing's amended complaint. The Diocese asserts that, even positing these facts as true, Tennessee's courts are without subject matter jurisdiction to adjudicate Mr. Redwing's claims. Accordingly, the Diocese's challenge to the trial court's subject matter jurisdiction is facial, not factual. Therefore, the trial court's decision regarding the existence of subject matter jurisdiction is a question of law. It follows, therefore, that we will review the lower courts' conclusions regarding subject matter jurisdiction without a presumption of correctness. *See Northland Ins. Co. v. State*, 33 S.W.3d at 729; *see also Schutte v. Johnson*, 337 S.W.3d at 769.

**B.**

The ecclesiastical abstention doctrine recognizes a type of "spiritual federalism." Rodney A. Smolla, *Words "Which by Their Very Utterance Inflict Injury": The Evolving Treatment of Inherently Dangerous Speech in Free Speech Law and Theory*, 36 Pepp. L. Rev. 317, 329 (2009). It reflects the principle that secular courts in the United States should normally "abstain" from adjudicating issues involving theological or spiritual judgment or the internal governance of religious bodies and, instead, should leave these matters to appropriate religious tribunals. Rodney A. Smolla, 1 *Rights and Liabilities in Media Content* § 6:25 (2d ed. 2011).

The birth of the ecclesiastical abstention doctrine has been traced to the United States Supreme Court's 1872 decision in *Watson v. Jones*. Rodney A. Smolla, 1 *Law of Defamation* § 6:74 (2d ed. 2011); Jana R. McCreary, *Tell Me No Secrets: Sharing, Discipline, and the Clash of Ecclesiastical Abstention and Psychotherapeutic Confidentiality*, 29 Quinnipiac L. Rev. 77, 88 (2011). In that case, the United States Supreme Court stated:

> In this country[,] . . . [t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the

---

[6]The principles and procedures governing factual challenges to a court's subject matter jurisdiction are not the same as the principles and procedures governing facial challenges to a court's subject matter jurisdiction. We need not address or discuss these differences in this appeal because the Diocese's challenge to the trial court's subject matter jurisdiction is a facial challenge.

ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

*Watson v. Jones*, 80 U.S. 679, 728-29 (1872). Returning to *Watson v. Jones* eight decades later, the United States Supreme Court noted that

[t]he opinion radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as

those of faith and doctrine.  Freedom to select the clergy . . .[7] we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (footnote omitted and added).

In a later case involving a dispute over the ownership of church property between local churches and a national organization, the United States Supreme Court noted that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 442, 449 (1969). However, the Court added that

First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.  If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.

---

[7]The language omitted from the quoted portion of *Kedroff* purported to limit the holding to circumstances "where no improper methods of choice are proven."  The *Kedroff* Court in a footnote tied this reference to language in *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16-17 (1929), which "has been regarded as dicta."  6 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 21.12, at 235 (4th ed. 2008).  In 1976, the United States Supreme Court held that

civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.  For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else in to the substantive criteria by which they are supposedly to decide the ecclesiastical question.  But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*,  426 U.S. 696, 713 (1976).

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. at 449. Based on this holding, the United States Supreme Court determined that the Georgia Supreme Court violated the First Amendment by exercising jurisdiction over a property dispute that required it to rule upon two disputed religious questions. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. at 449-50.

In 1976, echoing its holdings in *Watson*, *Kedroff*, and *Presbyterian Church in United States*, the United States Supreme Court noted that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law" and that a civil court in the United States must leave "ecclesiastical decisions . . . as it finds them" because they lack jurisdiction to decide "religious controversies." *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich,* 426 U.S. at 713.

Three years later, the United States Supreme Court reviewed another decision by the Georgia Supreme Court involving a dispute over church property caused by a schism within a local Presbyterian congregation. The Georgia Supreme Court resolved the dispute in favor of the majority of the local congregation employing what the court called the neutral principles of law method. *Jones v. Wolf*, 443 U.S. 595, 599-601 (1979). In theory, "[t]he method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf*, 443 U.S. at 603. While the Court approved the Georgia Supreme Court's use of the neutral principles of law analysis, *see Jones v. Wolf*, 443 U.S. at 602-07, it vacated the decision because the Georgia Supreme Court had not articulated the basis for deciding the case in favor of the majority of the local congregation. *Jones v. Wolf*, 443 U.S. at 609-10. The Court pointed out that if the decision regarding which faction represents the church involves "considerations of religious doctrine and polity," the Georgia courts must defer "to the presbyterial commission's determination of that church's identity." *Jones v. Wolf*, 443 U.S. at 608-09.

## C.

This Court strongly embraced the ecclesiastical abstention doctrine twenty years after the United States Supreme Court decided *Watson v. Jones*. Noting that "[t]he weight to be attached to the decisions of such ecclesiastical jurisdictions is well stated by Mr. Justice Miller in the great case of *Watson v. Jones*," *Nance v. Busby*, 91 Tenn. 303, 326, 18 S.W. 874, 879 (1892), this Court declared that

> [t]he relations of a member to his church are not contractual. No
> bond of contract, express or implied, connects him with his

communion, or determines his rights. Church relationship stands upon an altogether higher plane, and church membership is not to be compared to that resulting from connection with mere human associations for profit, pleasure, or culture. The church undertakes to deal only with the spiritual state of man. It does not appeal to his purely human and temporal interests. Admission to its fold is prescribed alone by the church, professing to act only upon the word of God. It claims the power of the keys by divine and not human authority. Its right to determine the grounds of admission has never been questioned. . . . Civil courts deal only with civil and property rights. They have, in this country, no ecclesiastical jurisdiction. . . . We are not to be understood as approving an expulsion from church membership by irregular methods, and without notice to the member. But here we have a fact to be dealt with – the fact that this church, sitting as a church, has determined for itself that it had the power and the right to exclude these complainants. They have, as a judicature, adjudged that they had the jurisdiction, and that the usage and law of the church did not demand other trial or notice than such as attended the public action of the church. . . . They may have erred in their procedure. It is not for a civil court to revise their action in a matter so vital to their freedom as a church. Defendants, in their answer, say: "They protest as a church against the effort of complainants to be reinstated to church membership by an appeal to the civil courts." "This church," say they, "with all deference to the honorable court, claims that in all matters purely ecclesiastical it is her prerogative, untrammeled by any earthly tribunal, to deal with its members, and that no civil tribunal is invested with the jurisdiction to annul its solemn decrees of excommunication of its members. It was never intended that the law should measure the religious stature of the citizen. Should a chancellor adjudicate who shall partake of the Lord's Supper, or shall any church stand a supplicant before any earthly judicature, and receive a reversal of a judgment of expulsion." These be strong words, but true.

*Nance v. Busby*, 91 Tenn. at 324-26, 18 S.W. at 879.

Over the course of more than a century following the *Nance v. Busby* decision, Tennessee's courts have continued to recognize ecclesiastically required jurisdictional

limitations on civil courts. Thus, the ecclesiastical abstention doctrine has been applied to preclude judicial review of matters involving religious institutions that are ecclesiastical and internal in nature. *See Mason v. Winstead*, 196 Tenn. 268, 272-73, 265 S.W.2d 561, 563 (Tenn. 1954) (removal of a minister); *Travers v. Abbey*, 104 Tenn. 665, 668, 58 S.W. 247, 247-48 (1900) (removal of a minister).

However, the application of the ecclesiastical abstention doctrine has not been extended to "questions of property or personal rights." *See Travers v. Abbey*, 104 Tenn. at 668, 58 S.W. at 247 (noting that applying the ecclesiastical abstention doctrine in the case did not "involve any questions of property or personal rights"). With regard to external affairs of religious institutions, this Court has applied the doctrine as a limit on the authority of civil courts to evaluate religious doctrine but has permitted adjudications based upon neutral principles. *See, e.g.*, *Book Agents of Methodist Episcopal Church, S. v. State Bd. of Equalization*, 513 S.W.2d 514, 524-25 (Tenn. 1974) (rejecting the Court of Appeals test for assessing the taxability of religious publications "based on whether the particular book or activity adhered to the 'doctrine and practice' or 'religious faith' of the respective denominations" in favor of a test that did not turn upon an assessment of religious doctrine).

**D.**

The Diocese asserts that even if the factual allegations in Mr. Redwing's complaint are taken as true, the doctrine of ecclesiastical abstention deprives Tennessee's civil courts of subject matter jurisdiction over Mr. Redwing's negligent hiring, retention, and supervision claims, as well as his breach of fiduciary duty claims. Mr. Redwing responds that the Diocese's facial challenge to the trial court's subject matter jurisdiction should fail because the ecclesiastical abstention doctrine should not be extended to apply to his claims in this case. We have concluded that the trial court has subject matter jurisdiction to adjudicate all of Mr. Redwing's claims and, therefore, that the Court of Appeals erred by concluding that the trial court lacked subject matter jurisdiction over Mr. Redwing's negligent hiring and retention claims.

There can be little question that the state and federal courts are currently sharply divided regarding the courts' subject matter jurisdiction over suits involving claims similar to those asserted by Mr. Redwing in this case. *See, e.g.*, *Petrell v. Shaw*, 902 N.E.2d 401, 408 n.6 (Mass. 2009) (noting that courts are divided on whether constitutional protections bar certain tort suits against religious institutions based upon the actions of members of the clergy). Reflecting on these conflicting decisions, the Mississippi Supreme Court recently noted that "any reasonable research of the issue will yield abundant cases, cites, quotes and authority for the position taken by both the Diocese and the [victims], as well as other positions cited by neither." *Roman Catholic Diocese of Jackson v. Morrison*, 2003-IA-

00743-SCT (¶ 22), 905 So. 2d 1213, 1223 (Miss. 2005) (collecting conflicting cases in appendices).

Our analysis begins with the recognition that religious institutions exist and function in the context of the broader secular community. *See Dobrota v. Free Serbian Orthodox Church St. Nicholas*, 952 P.2d 1190, 1195 (Ariz. Ct. App. 1998). The courts do not inhibit the free exercise of religion simply by opening their doors to a suit involving a religious organization. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. at 449. Thus, the weight of authority recognizes that religious institutions are not above the law, *see e.g.*, *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1244-45 (10th Cir. 2010) (quoting *Rayburn v. General Conference of Seventh Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)), and that, like other societal institutions, they may be amenable to suits involving property rights, torts, and criminal conduct, *see e.g.*, *Dobrota v. Free Serbian Orthodox Church St. Nicholas*, 952 P.2d at 1195; *Thibodeau v. American Baptist Churches of Conn.*, 994 A.2d 212, 219 (Conn. App. Ct. 2010); *Higgins v. Maher*, 258 Cal.Rptr. 757, 758 (Dist. Ct. App. 1989); *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. Ct. App. 1996); *see also Moses v. Diocese of Colo.*, 863 P.2d 310, 320 (Colo. 1993) (indicating that religious institutions do not have "broad immunity against being sued in civil courts").

In civil cases, the ecclesiastical abstention doctrine is implicated only when the alleged improper conduct that gave rise to the lawsuit is "rooted in religious belief." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002); *McKelvey v. Pierce*, 800 A.2d 840, 851 (N.J. 2002). Adjudication of disputes by state courts is appropriate in matters involving religious institutions, as long as the court can resolve the dispute by applying neutral legal principles and is not required to employ or rely on religious doctrine to adjudicate the matter. *See Jones v. Wolf*, 443 U.S. at 602-07; *New York Annual Conference of United Methodist Church v. Fisher*, 438 A.2d 62, 68 (Conn. 1980) (holding that "[i]t is now well established that state judicial intervention is justified when it can be accomplished by resort to neutral principles of law . . . that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith."); *McKelvey v. Pierce*, 800 A.2d at 856 (holding that the First Amendment does not apply if "the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion (e.g., where the church offers no religious-based justification for its actions and points to no internal governance rights that would actually be affected)"); *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. Ct. App. 2004) (noting that "a state may adopt an approach, including neutral principles of law, for resolving church disputes that do not involve consideration of doctrinal matters").

Adopting a more expansive application of the ecclesiastical abstention doctrine runs the risk of placing religious institutions in a preferred position, *Sanders v. Casa View Baptist*

-13-

*Church*, 134 F.3d 331, 336 (5th Cir. 1998), and favoring religious institutions over secular institutions could give rise to Establishment Clause concerns. *See* Zanita E. Fenton, *Faith in Justice: Fiduciaries, Malpractice & Sexual Abuse by Clergy*, 8 Mich. J. Gender & L. 45, 75 (2001) (noting that "non-application of tort principles where they might otherwise apply may be more like Establishment, creating an exception for religion"). Employing the application of the neutral legal principles approach enables the courts to "give no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities." *Malicki v. Doe*, 814 So. 2d 347, 361 (Fla. 2002).

In addition to the Establishment Clause concerns, adopting an expansive application of the ecclesiastical abstention doctrine that would include claims such as those made by Mr. Redwing in this case runs counter to the recognition that the justifications for the ecclesiastical abstention doctrine are "at their lowest ebb" in circumstances where religious institutions or their employees "harm innocent and unconsenting third parties." Marci A. Hamilton, *Religious Institutions, the No-Harm Doctrine, and the Public Good*, 2004 B.Y.U. L. Rev. 1099, 1115 (2004). In fact, then-Justice Rehnquist, in ruling on a petition for stay as a circuit justice, declared that

> [t]here are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. *See Serbian Eastern Orthodox Diocese v. Milivojevich*. But this Court never has suggested that those constraints similarly apply outside the context of such intraorganization disputes. Thus, *Serbian Eastern Orthodox Diocese* and the other cases cited by applicant are not in point. Those cases are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

*Gen. Council on Fin. and Admin. of United Methodist Church v. Superior Ct. of Cal., San Diego Cnty.*, 439 U.S. 1355, 1372-73 (1978) (citation omitted); *see also Roman Catholic Diocese of Jackson v. Morrison*, 2003-IA-00743-SCT (¶ 69), 905 So. 2d at 1236 (stating that "[w]e read *Watson* [*v. Jones*] to hold only that civil courts may not take jurisdiction over a religious organization's internal, ecclesiastical matters").

-14-

Claims against a religious institution asserting the negligent hiring of a member of the clergy do not inevitably enmesh the courts in religious doctrine or dogma. Accordingly, the Ohio Supreme Court has held that "even the most liberal construction of the First Amendment will not protect a religious organization's decision to hire someone who it knows is likely to commit criminal or tortious acts." *Byrd v. Faber*, 565 N.E.2d 584, 590 (Ohio 1991). Similarly, Justice William R. Roy of the Supreme Court of Onondaga County, New York denied a motion to dismiss similar to the one filed by the Bishop in this case, stating that if the

> plaintiffs are successful in establishing that, with knowledge that the priest was likely to commit sexual abuse on youths with whom he was put in contact, his employers placed or continued him in a setting in which such abuse occurred, the fact that the placement occurred in the course of internal administration of the religious units does not preclude holding the institutions accountable to the victim of their neglect in administration. Indeed, a contrary holding – that a religious body must be held free from any responsibility for wholly predictable and foreseeable injurious consequences of personnel decisions, although such decisions incorporate no theological or dogmatic tenets – would go beyond First Amendment protection and cloak such bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded.

*Jones ex rel. Jones v. Trane*, 591 N.Y.S.2d 927, 932 (Sup. Ct. 1992); *see also*, *e.g.*, *Prince of Peace Lutheran Church v. Linklater*, 28 A.3d 1171, 1184 (Md. 2011) (quoting *Jones ex rel. Jones v. Trane*, 591 N.Y.S.2d at 932); *McKelvey v. Pierce*, 800 A.2d at 857 (same); *Smith v. Privette*, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998) (same).

Based on our consideration of the decisions in similar cases handed down by our colleagues on other state and federal courts, we have concluded that the ecclesiastical abstention doctrine does not necessarily immunize religious institutions from all claims for damages based on negligent hiring, supervision, or retention. Tennessee's courts may address these claims, as long as they can do so using neutral principles of law and can refrain from resolving religious disputes and from relying on religious doctrine. *See Jones v. Wolf*, 443 U.S. at 602-07.

-15-

**E.**

In this case, the Diocese has not asserted any religious foundation for the alleged conduct upon which Mr. Redwing's claims are based. In fact, the Diocese strongly insists that any such actions would be directly contrary to the beliefs, teachings, and principles of the Roman Catholic Church. The Diocese does contend, however, that any adjudication of Mr. Redwing's negligent hiring, supervision, and retention claims will necessarily require addressing church doctrine and practices. On this basis, the Diocese argues that the ecclesiastical abstention bar applies.

The Diocese's argument overreaches the bounds of the protections afforded the ecclesiastical abstention doctrine.[8] *See generally Watson v. Jones*, 80 U.S. at 731 (quoting *Harmon v. Dreher*, 17 S.C. Eq. (Speers Eq.) 87 (1843) (Johnston, Ch.)) (noting that "[w]hen a civil right depends upon an ecclesiastical matter, . . . the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them"). The United States Supreme Court has noted that the First Amendment does not require "the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved." *Jones v. Wolf*, 443 U.S. at 605. However, the Court has also noted that if a court is required to resolve a religious controversy, it must "defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Jones v. Wolf*, 443 U.S. at 604.

Mr. Redwing is not free to convert his tort claims into an assault on the religious doctrines, practices, and customs of the Roman Catholic Church. Several of the allegations in Mr. Redwing's amended complaint stray into the protected domain of religious liberty. However, determining whether the ecclesiastical abstention doctrine requires the dismissal of a complaint does not depend on whether the complaint contains some allegations that would be improper for adjudication. Rather, it depends on whether the complaint contains

---

[8]The Arizona Court of Appeals found no merit in a similar argument when it held that

> The Board contends that, even if neutral principles of tort law applied, the court would still have to examine the structure of the Church of the Nazarene to properly define the duties of the various defendants. Maybe so. But the court can examine the structure of a religious organization for such a purpose. A court may examine religious documents so long as it is done in purely secular terms. *Wolf*, 443 U.S. at 604, 99 S.Ct. 3020. Any inquiry into the structure of the religious organization would not be undertaken to resolve any internal organizational dispute or the appropriateness of the conduct of the parties in relation to their religious beliefs or obligations. Inquiry into the organizational structure would be to factually determine the roles the parties played . . . .

*Rashedi v. General Bd. of Church of Nazarene*, 54 P.3d 349, 354-55 (Ariz. Ct. App. 2002).

claims that Tennessee's courts may properly adjudicate. If the complaint contains one or more of these claims, then Tennessee's civil courts are not entirely without subject matter jurisdiction over this case.

We find that Mr. Redwing's amended complaint contains claims over which Tennessee's civil courts plainly have subject matter jurisdiction. Mr. Redwing asserts that the Diocese was aware or should have been aware that Fr. Guthrie presented a danger to children and, nevertheless, placed him in a position where it was foreseeable that he would sexually abuse a child, as he allegedly did Mr. Redwing, on church property. The Diocese denies the existence of any religious basis for enabling sexual predators.[9] Accordingly, based on the record before us, it appears that Mr. Redwing will be able to pursue his negligent hiring, supervision, and retention claims without asking the trial court to resolve any religious disputes or to rely on religious doctrine. In other words, Mr. Redwing's claims can be pursued based upon breach of a secular duty by the Diocese without requiring the court to resolve disputes over religious questions.

**F.**

We decline to embrace the distinction drawn by the Court of Appeals between Mr. Redwing's negligent hiring and retention claims and his negligent supervision claim. Professors Lupu and Tuttle have correctly observed that "[t]he torts of negligent hiring, supervision, and retention all involve essentially the same questions: did the defendant have notice of the wrongdoer's propensity to commit sexual misconduct, authority to prevent the harm, and some duty of care to those who were harmed?" Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 B.Y.U. L. Rev. 1789, 1856 n.266 (2004) ("Lupu & Tuttle, 2004 B.Y.U. L. Rev."). When "[s]een in that light, hiring and retention are simply points along a continuum of opportunities for a principal to exercise control over its agents[, and] . . . [i]t is not clear . . . why that distinction should matter." Lupu & Tuttle, 2004 B.Y.U. L. Rev. at 1856 n.266.

Applying a "secular standard to secular conduct that is tortious is not prohibited by the Constitution." *Moses v. Diocese of Colo.*, 863 P.2d at 320. Accordingly, subjecting a religious institution to liability based on its knowledge of the sexual predilections of its clergy does not require interference with the institution's beliefs. As Professor Hamilton has explained:

---

[9]Mr. Redwing does not dispute the Diocese's assertion that church doctrine neither permits nor encourages the placement of priests, known or suspected to be pedophiles, in positions where they can prey on children. Should issues regarding church doctrine arise in the course of the proceeding, the trial court would be required to defer to the religious institution for the answer.

> [I]t is both logical and sensible to pose the legal question as whether the person being considered or retained is appropriate for a job involving access to children, period. The secular courts need not look at the church's beliefs in order to take evidence of the organization's actions solely relating to children, just as it need not investigate beliefs when it weighs evidence involving a bounced check or a breach of contract. The church, of course, can also place religious restrictions on candidates and use religious principles in choosing any particular person for ministry. The question here is not qualifications for ministry per se, but rather employment for a position relating to children.

Marci A. Hamilton, *The Waterloo for the So-Called Church Autonomy Theory: Widespread Clergy Abuse and Institutional Cover-Up*, 29 Cardozo L. Rev. 225, 242 (2007). The Supreme Court of Mississippi has also noted:

> We are satisfied that the cloak of religion, which does not shield religious institutions from civil responsibility for fraud or breach of contract, surely cannot serve to shield such institutions from civil responsibility for more abhorrent conduct such as sexual molestation of a child. Nor should it shield those who fail in their duty to protect children from it.

*Roman Catholic Diocese of Jackson v. Morrison*, 2003-IA-00743-SCT (¶ 74), 905 So. 2d at 1237.

## G.

The Court of Appeals failed to address whether Tennessee's civil courts have subject matter jurisdiction over Mr. Redwing's breach of a fiduciary duty claim. We will address this issue because it was argued in briefing before the trial court, the Court of Appeals, and this Court. We have concluded that the ecclesiastical abstention doctrine does not impose an absolute bar on claims for breach of fiduciary duty[10] against religious institutions.

---

[10]Recently, we held that a fiduciary relationship "arises when one person reposes special trust and confidence in another person and that other person—the fiduciary—undertakes to assume responsibility for the affairs of the other party." *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 641-42 (Tenn. 2008). From this relationship arises a fiduciary duty "to act for and to give advice for the benefit of the other person on matters within the scope of the relationship." *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d at 642.

Among the majority of courts that have permitted clerical sexual abuse claims against religious institutions to proceed, several courts have allowed breach of fiduciary claims to proceed, but only when the proof of the fiduciary relationship is not predicated solely on religious duties or religious authority. *See, e.g.*, *Petrell v. Shaw*, 902 N.E.2d at 406-07. For example, the Supreme Court of Mississippi has stated that "a priest may not be held to be in a fiduciary relationship merely based upon his status as a priest." *Mabus v. St. James Episcopal Church*, 2003-CA-00123-SCT (¶ 28), 884 So. 2d 747, 760 (Miss. 2004).

This limitation on claims based on breach of fiduciary duty arises from the constitutional concerns that

> the religious status of persons and the religious character of institutions should not give rise to fiduciary duties as a matter of law. In applying the law of fiduciary duty, courts should take great care to avoid the imposition, by juries and others, of liability for breaches of duties that are distinctly religious.

Lupu & Tuttle, 2004 B.Y.U. L. Rev. at 1797. While courts have, with some regularity, found fiduciary relationships to exist on other grounds between ministers and parishioners, "rarely has a court found such a fiduciary relationship between . . . a Diocese . . . and a parishioner. Such a fiduciary relationship will likely exist only where there is a unique relationship between the Diocese and the individual, or where the Diocese assumes some duties toward the parishioner." W. Cole Durham & Robert Smith, 2 *Religious Organizations and the Law* § 11:43 (2011).

A religious institution's fiduciary obligations cannot be predicated on a religious duty and cannot arise solely from the relationship between the institution and its members. Thus, breach of fiduciary obligation claims against religious institutions remain quite rare. However, the status of a defendant as a religious institution does not, by itself, preclude the existence of a fiduciary relationship and the possibility of a breach of fiduciary duty claim. Accordingly, we find that Tennessee's civil courts may exercise jurisdiction over a breach of fiduciary duty claim against a religious institution, as long as the fiduciary relationship is not based on a religious duty or is not inextricably tied to a religious duty.

## III.

The second issue in this case involves the decision of the majority of the Court of Appeals that the trial court erred by failing to find that all of Mr. Redwing's claims were time-barred. The parties' dispute does not involve a disagreement over when the underlying tortious conduct occurred or when Mr. Redwing became eighteen years old. Rather, the parties' dispute centers on the application of three doctrines – the discovery rule, fraudulent

concealment, and equitable estoppel – to the facts of this case. Based on the present record, we have concluded that the dismissal of Mr. Redwing's claims on statute of limitations grounds was premature.

## A.

The Diocese chose a Tenn. R. Civ. P. 12.02(6) motion as its vehicle for seeking dismissal of Mr. Redwing's complaint based on the statute of limitations.[11] A Tenn. R. Civ. P. 12.02(6) motion tests only the legal sufficiency of the plaintiff's complaint, not the strength of the plaintiff's proof. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009). Thus, courts ruling on a Tenn. R. Civ. P. 12.02(6) motion "'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011) (quoting *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31-32 (Tenn. 2007)). The determination of whether a suit should be dismissed based on the statute of limitations presents a question of law which we review de novo with no presumption of correctness. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 144 (Tenn. 2001).

## B.

Statutes of limitations promote fairness and justice. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002). They are shields, not swords, *Lawman v. Barnett*, 180 Tenn. 546, 565, 177 S.W.2d 121, 128 (1944), and they reflect "'a societal choice that actions must be brought within a certain time period.'" *Parrish v. Marquis*, 172 S.W.3d 526, 532 (Tenn. 2005) (quoting *Palmer Dev. Corp. v. Gordon*, 1999 ME 22, ¶ 11, 723 A.2d 881, 884). They are based on the presumption that persons with the legal capacity to litigate will not delay bringing suit on a meritorious claim beyond a reasonable time. *Hackworth v. Ralston Purina Co.*, 214 Tenn. 506, 510, 381 S.W.2d 292, 294 (1964); *see also Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1869).

We have frequently pointed out that statutes of limitations (1) promote stability in personal and business relationships, *see Potts v. Celotex Corp.*, 796 S.W.2d 678, 684 (Tenn. 1990) (quoting *Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn. 1974)), (2) give notice to defendants of potential lawsuits, *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 33 (Tenn. 2007), (3) prevent undue delay in filing lawsuits, *Leach v. Taylor*, 124 S.W.3d 87, 90 (Tenn. 2004) (quoting *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994)); *Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996), (4) "avoid the uncertainties and burdens

---

[11] A Tenn. R. Civ. P. 12.02(6) motion is an appropriate way to seek to invoke the statute of limitations as grounds for dismissing a complaint. *See Hawk v. Chattanooga Orthopaedic Grp., P.C.*, 45 S.W.3d 24, 28 (Tenn. Ct. App. 2000); 1 Pivnick § 11:3, at 857-58.

inherent in pursuing and defending stale claims," *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 533 (Tenn. 1998); *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 855 (Tenn. 1995), and (5) "ensure that evidence is preserved and facts are not obscured by the lapse of time or the defective memory or death of a witness," *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d at 621; *Applewhite v. Memphis State Univ.*, 495 S.W.2d 190, 195 (Tenn. 1973) (quoting *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945)). Accordingly, the courts construe exceptions to statutes of limitations carefully to assure that they are not extended beyond their plain meaning. *See Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006) (quoting *Owen v. Summers*, 97 S.W.3d 114, 123 (Tenn. Ct. App. 2001)); *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453 (7th Cir. 1990).

A defense predicated on the statute of limitations triggers the consideration of three components – the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines. All of these elements are inter-related and, therefore, should not be considered in isolation. Carli McNeill, Note, *Seeing the Forest: A Holistic View of the RICO Statute of Limitations*, 85 Notre Dame L. Rev. 1231, 1231 (2010). Arriving at a fair and just application of these inter-related elements in a particular case can be challenging. As Judge Posner has noted, "the law concerning statutes of limitations fairly bristles with subtle, intricate, often misunderstood issues." *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 849 (7th Cir. 1996), *abrogated on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997).

## C.

The length of the limitations period is perhaps the most straightforward of the three elements. Statutes of limitations are predominantly "creatures of the legislative branch of government." *Carney v. Smith*, 222 Tenn. 472, 477, 437 S.W.2d 246, 248 (1969). Accordingly, subject only to limitations in the state and federal constitutions,[12] the General Assembly customarily defines limitations periods by statute. *See generally McDaniel v. Mulvihill*, 196 Tenn. 41, 48, 263 S.W.2d 759, 762 (1953); *Graves v. Grady's Inc.*, 906 S.W.2d 463, 466 (Tenn. Ct. App. 1995).

The choice of the correct statute of limitations is made by considering the "'gravamen of the complaint.'" *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006) (quoting *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 638 (Tenn. 2003)). In common parlance, this rather

---

[12]*See Morris v. Gross*, 572 S.W.2d 902, 906-07 (Tenn. 1978) (invalidating an abbreviation of the limitations period for already pending medical malpractice claims on due process grounds).

elliptical phrase[13] refers to the "substantial point," the "real purpose," or the "object" of the complaint. *Estate of French v. Stratford House*, 333 S.W.3d 546, 557 (Tenn. 2011) (quoting *Black's Law Dictionary* 770 (9th ed. 2009)) ("substantial point"); *Bland v. Smith*, 197 Tenn. 683, 686, 277 S.W.2d 377, 379 (1953) ("real purpose"); *Bodne v. Austin*, 156 Tenn. 353, 360, 2 S.W.2d 100, 101 (1928) ("object"), *overruled on other grounds by Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn. 1974). It does not involve the "designation" or "form" of the action. *Pera v. Kroger Co.*, 674 S.W.2d 715, 719 (Tenn. 1984) ("designation"); *Callaway v. McMillian*, 58 Tenn. (11 Heisk.) 557, 559 (1872) ("form"). Determining the "gravamen of the complaint" is a question of law. *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d at 638.

**D.**

The concept of accrual relates to the date on which the applicable statute of limitations begins to run. *Columbian Mut. Life Ins. Co. v. Martin*, 175 Tenn. 517, 526, 136 S.W.2d 52, 56 (1940); *see also McSpadden v. Parkenson*, 10 Tenn. App. 11, 18 (1928); 22 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 12:80, at 601 (2006). The traditional accrual rule was that a cause of action accrues and the applicable statute of limitations begins to run "when the plaintiff has a cause of action and the right to sue." *Armistead v. Clarksville-Montgomery Cnty. Sch. Sys.*, 222 Tenn. 486, 490, 437 S.W.2d 527, 528-29 (1969). The statute of limitations began to run even though "the person entitled to an action . . . [had] no knowledge of his right to sue, or the facts out of which this right arises." 2 H.G. Wood, *A Treatise on the Limitation of Actions* § 276c(1), at 1411 (4th rev. ed 1916) ("Wood"). Accordingly, under the traditional accrual rule, the cause of action accrued in personal injury cases "immediately upon the infliction or occurrence of [the] injury." *Teeters v. Currey*, 518 S.W.2d at 515-16; *Bodne v. Austin*, 156 Tenn. at 370-71, 2 S.W.2d at 105.

The traditional accrual rule had another significant attribute. Once the statute of limitations began to run, it did not cease for any intervening disability, *Lawrence v. Thornhill*, 1 Tenn. Cas. (Shannon) 388, 390 (1875); *Jones v. Preston*, 40 Tenn. (3 Head) 161, 162 (1859), or for any other subsequent event not contemplated by the limitations statute itself. 1 Wood § 6, at 12.

As time passed, there was a growing awareness that the policies furthered by statutes of limitations should give way when the interests of justice would be served by permitting plaintiffs to pursue their legitimate claims. *See Burnett v. N.Y. Cent. R.R.*, 380 U.S. 424, 428 (1965). In 1950, the Harvard Law Review suggested an exception to the traditional rule "in those situations where the plaintiff is generally unlikely to learn of the harm before the

_____

[13]One authority has characterized the phrase as "infelicitously redundant." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 391 (2d ed. 1995).

remedy expires." *Developments in the Law – Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1203 (1950). In the intervening years, courts and legislatures began to recognize exceptions to the traditional accrual rules that "take the sting out of a statute of limitations for equitable reasons." Adam Bain & Ugo Colella, *Interpreting Federal Statutes of Limitations*, 37 Creighton L. Rev. 493, 502 (2004) ("Bain & Colella").

Harvard Law Review's suggestion rapidly gained acceptance as many state courts and legislatures adopted what is now known as the "discovery rule." In 1974, this Court recognized and adopted the discovery rule in response to the "harsh and oppressive" results of the traditional accrual rule in circumstances in which the injured party was unaware of the injury. *Teeters v. Currey*, 518 S.W.2d at 516. The Court, expressly limiting its decision to surgical malpractice cases, held that "the cause of action accrues and the statute of limitations commences to run when the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." *Teeters v. Currey*, 518 S.W.2d at 517. In his concurring opinion, Justice Harbison noted that "[i]n the vast majority of personal injury cases . . . the date of the injury and the date of discovery are simultaneous." *Teeters v. Currey*, 518 S.W.2d at 518 (Harbison, J., concurring); *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d at 450.

The Court later expanded the application of the discovery rule to many other injuries to persons or property. *See McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1975) (holding that "in tort actions . . . the cause of action accrues . . . when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered."); *see also* Justin N. Joy, Comment, *Civil Procedure –* Pero's Steak & Spaghetti House v. Lee: *Tennessee Declines to Extend the Discovery Rule to Claims of Converted Negotiable Instruments*, 34 U. Mem. L. Rev. 475, 487 & n.63 (2004) (cataloging the causes of action to which the discovery rule applies). The Court has also declined to apply the discovery rule to certain types of claims. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d at 624 (declining to apply the discovery rule in cases involving the conversion of negotiable instruments).

Following our decision in *Teeters v. Currey*, this Court refined the discovery rule to make clear that it included not only the discovery of the injury but also the discovery of the source of the injury. *Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010) (holding that the cause of action accrues when the plaintiff discovers both the injury and the "identity of the person or persons whose wrongful conduct caused the injury"); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (holding that the cause of action accrues when the plaintiff knows or should know that it sustained an injury "as a result of wrongful . . . conduct by the defendant"); *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 855 (Tenn. 1995) (holding that "a prerequisite to the running of the statute of limitations is [the] plaintiff's reasonable knowledge of the injury, its cause and origin"); *Foster v. Harris*, 633 S.W.2d 304,

305 (Tenn. 1982) (holding that "no judicial remedy [is] available to [a] plaintiff until he [or she] discover[s], or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his [or her] injury; and (2) the identity of the defendant who breached the duty.").

The Court also made it clear that the discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages, *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010); *Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996) (holding that the plaintiff cannot delay filing suit "until all injurious effects or consequences of the actionable wrong are fully known"), or until the plaintiff knows the specific type of legal claim it has, *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d at 533; *see also Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997); *Wyatt v. A-Best, Co.*, 910 S.W.2d at 855. The discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim. *Mills v. Booth*, 344 S.W.3d 922, 929 (Tenn. Ct. App. 2010) (quoting *Burk v. RHA/Sullivan, Inc.*, 220 S.W.3d 896, 902 (Tenn. Ct. App. 2006)).

Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995) (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994)). This latter circumstance is variously referred to as "constructive notice"[14] or "inquiry notice."[15] Quoting the Iowa Supreme Court, we have explained that inquiry notice "charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed. . . . [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate 'the injury,' the limitation period begins to run." *Sherrill v. Souder*, 325 S.W.3d at 593 n.7 (quoting *Rathje v. Mercy Hosp.*, 745 N.W.2d 443, 461 (Iowa 2008)); *see also Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996) (defining inquiry notice as the "notice which a plaintiff would have possessed after due investigation").

---

[14] *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d at 532; *Lufkin v. Conner*, 338 S.W.3d 499, 503 (Tenn. Ct. App. 2010).

[15] *Sherrill v. Souder*, 325 S.W.3d at 594-95; *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680-81 (Tenn. 1990) (quoting *Hoffman v. Hosp. Affiliates, Inc.*, 652 S.W.2d 341, 344 (Tenn. 1983)); *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d at 718.

**E.**

In addition to the relaxation of the traditional accrual rules, both the Tennessee General Assembly and the courts have recognized various tolling doctrines that suspend or extend the running of the limitations period. For example, the General Assembly has enacted statutes tolling the statute of limitations (1) for minors and for adults who lack the capacity to sue,[16] (2) for civil claims by plaintiffs who have been enjoined from filing suit,[17] (3) for claims against personal representatives of a decedent's estate,[18] and (4) for claims against out-of-state defendants who are not otherwise amenable to service of process.[19] More recently, the General Assembly has provided for tolling the statute of limitations during times of disaster.[20]

This Court has likewise recognized several tolling doctrines. In civil proceedings, we have recognized and applied the doctrines of equitable estoppel and fraudulent concealment to toll the running of the statute of limitations. In criminal proceedings, we have recognized the doctrine of "due process" tolling. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001); *Seals v. State*, 23 S.W.3d 272, 279 (Tenn. 2000); *Burford v. State*, 845 S.W.2d 204, 209 (Tenn. 1992). However, unlike other state courts and the federal courts, we have declined to recognize the doctrine of equitable tolling in civil cases. *See Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145 n.2; *Norton v. Everhart*, 895 S.W.2d 317, 321 (Tenn. 1995). We have also declined to recognize the doctrine of cross-jurisdictional tolling. *See Maestas v. Sofamore Danek Grp., Inc.*, 33 S.W.3d 805, 808 (Tenn. 2000).

### EQUITABLE ESTOPPEL

The doctrine of equitable estoppel arises from the equitable maxim that no person may take advantage of his or her own wrong.[21] In the context of a defense predicated on a statute of limitations, the doctrine of equitable estoppel tolls the running of the statute of limitations

---

[16]Tenn. Code Ann. § 28-1-106 (Supp. 2011).

[17]Tenn. Code Ann. § 28-1-109 (2000).

[18]Tenn. Code Ann. § 28-1-110 (2000).

[19]Tenn. Code Ann. § 28-1-111 (2000); *Arrowood v. McMinn Cnty.*, 173 Tenn. 562, 565-68, 121 S.W.2d 566, 567-69 (1938).

[20]Tenn. Code Ann. § 28-1-116 (Supp. 2011).

[21]*See Richardson v. Snipes*, 46 Tenn. App. 494, 515, 330 S.W.2d 381, 390 (1959) (quoting 1 Henry R. Gibson, *Gibson's Suits in Chancery* § 60, at 74 (5th ed. 1955)) ("One of the maxims of equity is, 'No one can take advantage of his own wrong.'"); *see also* 18 Tenn. Jur. *Limitation of Actions* § 42, at 124-25 (2005).

when the defendant has misled the plaintiff into failing to file suit within the statutory limitations period. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145; *Ingram v. Earthman*, 993 S.W.2d 611, 633 (Tenn. Ct. App. 1998). When the doctrine of equitable estoppel is applicable, it prevents a defendant from asserting what could be an otherwise valid statute of limitations defense. *Hardcastle v. Harris*, 170 S.W.3d 67, 84 (Tenn. Ct. App. 2004).

The party invoking the doctrine of equitable estoppel has the burden of proof. *Hardcastle v. Harris*, 170 S.W.3d at 85. Thus, whenever a defendant has made out a prima facie statute of limitations defense, the plaintiff must demonstrate that the defendant induced him or her to put off filing suit by identifying specific promises, inducements, suggestions, representations, assurances, or other similar conduct by the defendant that the defendant knew, or reasonably should have known, would induce the plaintiff to delay filing suit. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145; *Hardcastle v. Harris*, 170 S.W.3d at 85. The plaintiff "must also demonstrate that [his or her] delay in filing suit was not attributable to [his or her] own lack of diligence." *Hardcastle v. Harris*, 170 S.W.3d at 85.

The doctrine of equitable estoppel applies only when the defendant engages in misconduct. *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d at 849 (quoting *Norton v. Everhart*, 895 S.W.2d at 321). Examples of circumstances which have prompted the courts to invoke the doctrine of equitable estoppel to prevent a defendant from asserting a statute of limitations defense include: (1) when a defendant promises not to assert a statute of limitations defense,[22] (2) when a defendant promises to pay or otherwise satisfy the plaintiff's claim without requiring the plaintiff to file suit,[23] and (3) when a defendant promises to settle a claim without litigation following the conclusion of another proceeding between the defendant and a third party.[24]

In the context of defenses predicated on a statute of limitations, the doctrine of equitable estoppel always involves allegations that the defendant misled the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146. The focus of an equitable estoppel inquiry "is on the defendant's conduct and the reasonableness of the plaintiff's reliance on that conduct." *Hardcastle v. Harris*, 170 S.W.3d at 85; *see also Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146. Determining whether to invoke the doctrine of equitable estoppel to counter a statute of limitations defense requires the courts to examine the facts and circumstances of the case to determine whether the defendant's conduct is sufficiently unfair or misleading to

---

[22]*American Mut. Liab. Ins. Co. v. Baxter*, 210 Tenn. 242, 247-48, 357 S.W.2d 825, 827 (1962).

[23]*Brick Church Transmission, Inc. v. Southern Pilot Ins. Co.*, 140 S.W.3d 324, 335 (Tenn. Ct. App. 2003) (quoting *Fairway Vill. Condo. Ass'n, Inc. v. Connecticut Mut. Life Ins. Co.*, 934 S.W.2d 342, 346 (Tenn. Ct. App. 1996)).

[24]*Hardcastle v. Harris*, 170 S.W.3d at 85-86.

outweigh the public policy favoring the enforcement of statutes of limitations. *Hardcastle v. Harris*, 170 S.W.3d at 85.

Plaintiffs asserting equitable estoppel must have acted diligently in pursuing their claims both before and after the defendant induced them to refrain from filing suit. The statute of limitations is tolled for the period during which the defendant misled the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146; *Lusk v. Consolidated Aluminum Corp.*, 655 S.W.2d 917, 920-21 (Tenn. 1983). The plaintiff must demonstrate that suit was timely filed after the plaintiff knew or, in the exercise of reasonable diligence, should have known that the conduct giving rise to the equitable estoppel claim had ceased to be operational. *See Ingram v. Earthman*, 993 S.W.2d at 633. At the point when the plaintiff knows or should know that the defendant has misled him or her, the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146.[25]

<h3 align="center">FRAUDULENT CONCEALMENT</h3>

For over a century now, Tennessee's courts have also held that the doctrine of fraudulent concealment will toll the running of a statute of limitations. *In re Estate of Davis*, 308 S.W.3d 832, 841 (Tenn. 2010); *Woodfolk v. Marley*, 98 Tenn. 467, 471, 40 S.W. 479, 480 (1897); *Porter's Lessee v. Cocke*, 7 Tenn. (1 Peck) 29, 41 (1823), *overruled on other grounds by Love v. Harper*, 23 Tenn. (4 Hum.) 113, 117 (1843). This doctrine is one of the oldest exceptions to the statute of limitations. *See Bailey v. Glover*, 88 U.S. 342, 348-49 (1874). While the doctrine of fraudulent concealment shares many of the attributes of the doctrine of equitable estoppel, Tennessee's courts, like most courts, have recognized it as a free-standing doctrine. *See* Bain & Colella, 37 Creighton L. Rev. at 506 (noting that "[m]ost courts do not explicitly classify fraudulent concealment as either equitable estoppel or equitable tolling, but rather treat it sui generis").

As it currently exists in Tennessee, the doctrine of fraudulent concealment is aligned with the discovery rule.[26] Under the fraudulent concealment doctrine, the statute of

---

[25]On this point, *Fahrner v. SW Mfg., Inc.* appears to reverse *Ingram v. Earthman*, 993 S.W.2d at 633 and *Fairway Vill. Condo. Ass'n v. Connecticut Mut. Life Ins. Co.*, 934 S.W.2d 342, 346 (Tenn. Ct. App. 1996) in which the Court of Appeals adopted the majority rule that if the basis for estoppel ends before the statute of limitations has run, the plaintiff must file suit within the original limitations period if reasonable time remains within which to file suit. Likewise, if the basis for estoppel ends after the statute of limitations has run, the plaintiff must file suit within a reasonable time. Because the parties in this case have not joined issue on this point, we need not reconsider it in the present case.

[26]We have explained that "[i]n a discovery rule case, the plaintiff may claim that the defendant (continued...)

limitations is tolled when "the defendant has taken steps to prevent the plaintiff from discovering he [or she] was injured." *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 146. While other decisions couch the fraudulent concealment doctrine in terms of the defendant taking affirmative steps "to conceal the cause of action,"[27] the reference to "cause of action" in this context is synonymous with the plaintiff's injury.[28]

Until today, the cases applying the fraudulent concealment doctrine have involved circumstances in which the defendant has fraudulently concealed the existence of the plaintiff's injury and the plaintiff was not otherwise aware that he or she had been injured. However, circumstances can also arise in which the plaintiff is aware that he or she had been injured but does not know or have reason to know the identity of the person or persons who caused the injury. In this circumstance, the discovery rule would apply in precisely the same way that it would apply in circumstances in which the plaintiff did not know or have reason to know that he or she had been injured. *See Sherrill v. Souder*, 325 S.W.3d at 595 (holding that the cause of action accrues when the plaintiff discovers both the injury and the "identity of the person or persons whose wrongful conduct caused the injury"); *Wyatt v. A-Best Co.*, 910 S.W.2d at 855 (holding that a prerequisite to the running of a statute of limitations is the plaintiff's "reasonable knowledge of the injury, its cause and origin").

Professor John Dawson has observed that "there is abundant authority for the proposition that direct misrepresentation or other active steps to conceal the identity of the wrongdoer do justify delay and [the suspension of] the statute." John P. Dawson, *Fraudulent Concealment and Statutes of Limitation*, 31 Mich. L. Rev. 875, 914 (1933). Accordingly, we have concluded that the doctrine of fraudulent concealment applies not only to circumstances in which the defendant purposefully engages in conduct intended to conceal the plaintiff's injury from the plaintiff but also to circumstances in which the defendant engages in conduct intended to conceal the identity of the person or persons who caused the plaintiff's injury from the plaintiff.

A claim of fraudulent concealment to toll the running of a statute of limitations contains four elements. The plaintiff invoking the fraudulent concealment doctrine must

---

[26](...continued)
intentionally prevented him from discovering his injury. Where that claim is proved true, the doctrine of 'fraudulent concealment' applies." *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145.

[27]*See, e.g.*, *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998).

[28]*See Albert v. Sherman*, 167 Tenn. 133, 138, 67 S.W.2d 140, 141 (1934) (noting that "it is the original injury which is the cause of action, or which gives rise to the cause of action, and that the damage sustained is not the cause of action. The statute begins to run when the cause of action accrues."), *overruled on other grounds by Teeters v. Currey*, 518 S.W.2d at 514-17.

allege and prove: (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so;[29] (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence;[30] (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer;[31] and (4) that the defendant concealed material information from the plaintiff by "'withholding information or making use of some device to mislead' the plaintiff in order to exclude suspicion or prevent inquiry."[32]

Plaintiffs asserting the doctrine of fraudulent concealment to toll the running of a statute of limitations must demonstrate that they exercised reasonable care and diligence in pursuing their claim. *See Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977); *Ray v. Scheibert*, 224 Tenn. 99, 104, 450 S.W.2d 578, 580-81 (1969). The statute of limitations is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim. *See Fahrner v. SW Mfg., Inc.*, 48 S.W.3d at 145. At the point when the plaintiff discovers or should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim, the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period.

**IV.**

Because of the procedural posture of this case, the record is far from sufficient to permit the courts to make a conclusive determination regarding whether Mr. Redwing's claims against the Diocese are time-barred. While the record reflects that the Diocese made out a prima facie defense based on the statute of limitations, the question before us is whether the factual allegations in Mr. Redwing's amended complaint regarding the statute of limitations issue are sufficient to survive a Tenn. R. Civ. P. 12.02(6) motion to dismiss.

---

[29] *See Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d at 625; *Shadrick v. Coker*, 963 S.W.2d at 735.

[30] *See Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d at 625; *Shadrick v. Coker*, 963 S.W.2d at 735.

[31] *See Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d at 625; *Shadrick v. Coker*, 963 S.W.2d at 735.

[32] *Shadrick v. Coker*, 963 S.W.2d at 735 (quoting *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992)).

Turning to the three elements to be considered in the context of a statute of limitations defense,[33] there is no question in this case regarding the applicable statute of limitations or the length of the limitations period. Even though Mr. Redwing's complaint is less than specific about when the alleged sexual abuse occurred,[34] there is no dispute that Mr. Redwing was a minor at the time. It is also undisputed that Mr. Redwing's eighteenth birthday occurred on August 18, 1978 and that, in accordance with Tenn. Code Ann. § 28-1-106, he had one year[35] from that date to file suit against Fr. Guthrie and any other person or entity that caused the alleged abuse. There is likewise no dispute that Mr. Redwing did not file suit against the Diocese until August 15, 2008 – almost twenty-nine years after the statute of limitations would have expired.

These undisputed facts are sufficient, in and of themselves, to establish the Diocese's statute of limitations defense. Thus, the burden shifts to Mr. Redwing to demonstrate that the allegations in his amended complaint are sufficient to articulate at least a colorable basis for concluding that the statute of limitations has not run on his claims against the Diocese. Taking the allegations in Mr. Redwing's amended complaint in their best light, Mr. Redwing counters the Diocese's statute of limitations defense by asserting that the Diocese fraudulently concealed its knowledge of Fr. Guthrie's history and propensity for sexually abusing minors and misled him and his parents into believing that it was unaware of Fr. Guthrie's conduct. As a result of the Diocese's conduct, Mr. Redwing argues that he should not be deemed to have discovered his claims against the Diocese. He also argues that because of its conduct, the Diocese should be equitably estopped to assert a statute of limitations defense.

The majority of the Court of Appeals, citing *C.S. v. Diocese of Nashville*, No. M2007-02076-COA-R3-CV, 2008 WL 4426891, at *3 (Tenn. Ct. App. Sept. 30, 2008), *perm. app. denied* (Tenn. Mar. 16, 2009) and *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d at 731 n.17, found that Mr. Redwing was on inquiry notice because he "knew he was abused, knew the identity of the abuser, and knew the abuser was an employee of the employer." *Redwing v. Catholic Bishop for Diocese of Memphis*, 2010 WL 2106222, at *7.

---

[33] As discussed in Section III, the three elements that must be considered with regard to a statute of limitations defense include (1) length of the limitations period, (2) the accrual of the plaintiff's claim, and (3) the applicability of tolling doctrines.

[34] The complaint states that the alleged acts occurred between 1972 and 1974.

[35] Tenn. Code Ann. § 28-3-104(a)(1) (2000) provides for a one-year statute of limitations for personal injury actions.

We take no issue with this conclusion.[36]  However, we depart from the majority and agree with Judge Kirby that dismissing Mr. Redwing's complaint for failure to exercise reasonable diligence in pursuing these claims was premature.

**A.**

We turn first to Mr. Redwing's equitable estoppel claim.  As we have already noted, the essence of an equitable estoppel claim when it is used to defeat a statute of limitations defense is that the defendant intentionally induced the plaintiff to delay filing suit within the time required by the statute of limitations. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d at 145. Accordingly, the claim necessarily presupposes that the plaintiff was aware of his or her claim but put off pursuing it because of the defendant's promises, suggestions, or inducements that filing suit would be unnecessary.

The factual allegations in Mr. Redwing's amended complaint are inconsistent with an equitable estoppel claim.  Mr. Redwing repeatedly asserts in his amended complaint that he was unaware that he had a claim against the Diocese because the Diocese "misled" him and his family.  If we take these assertions as true, as we must, Mr. Redwing did not know that he had a claim against the Diocese until after the statute of limitations ran on his claim.  This lack of knowledge, while not inconsistent with a fraudulent concealment claim, undermines his equitable estoppel claim because knowledge of a claim against the defendant prior to the running of the statute of limitations is a necessary ingredient of an equitable estoppel claim.

---

[36]The Court of Appeals' conclusion is in accord with the approaches adopted by courts in other jurisdictions in addressing statute of limitations issues in similar cases. *See e.g.*, *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 773 (D.C. 1998) (concluding that sexual abuse victims were on inquiry notice of claims against the diocese where they knew the alleged abuser was a priest, that the priest was a subordinate representative of the diocese, and abuse occurred on church premises); *Mark K. v. Roman Catholic Archbishop*, 79 Cal. Rptr. 2d 73, 79 (Cal. Ct. App. 1998) (determining that knowledge that one was abused by a priest and the priest was an employee of the diocese was sufficient to put an alleged sexual abuse victim on inquiry notice of claims against the diocese); *Doe v. Archdiocese of Washington*, 689 A.2d 634, 644 (Md. Ct. Spec. App. 1997) (finding that an alleged victim of sexual abuse by a priest is on inquiry notice of potential claims against the diocese based upon knowing that the abuser is a priest); *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006) (concluding that sexual abuse victims were on inquiry notice of potential claims against the Diocese because they "knew the identity of their abusers and that the abusers were employed by the Diocese"); *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, at ¶¶ 28-34, (concluding that knowledge that one was abused by a priest and that the priest was employed by the diocese puts an alleged sexual abuse victim on inquiry notice of claims against the diocese); *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 50, 156 P.3d 806, 819 (Utah 2007) (concluding that parochial school students were on inquiry notice with regard to potential claims against the church diocese, archdiocese, religious order, and parochial school of the priest who abused them based upon their knowledge that they were abused by a priest and the priest's employment relationship with the various institutional defendants).

## B.

The majority of the Court of Appeals discounted the allegations in Mr. Redwing's complaint supporting his fraudulent concealment claim because they were conclusory and insufficient to show that Mr. Redwing had exercised reasonable diligence in undertaking to obtain information regarding his claims against the Diocese. Mr. Redwing's amended complaint contains numerous allegations against the Roman Catholic Church in general and the Diocese in particular. With regard to the Roman Catholic Church, the complaint states that

> It is the practice of the Roman Catholic Church, through its cardinals, bishops, priests and other officials and agents, to conceal instances of child sexual abuse and complaints by victims. [The Roman Catholic Church] zealously maintains the secrecy of the horrifying truth of rampant child sexual abuse in The Church, by among other things:
>
> • Failing to disclose complaints to law enforcement officials, parishoners and the public;
> • Maintaining secret archives and files of evidence of sex abuse, accessible only to the bishops;
> • Instructing Church officials in destruction of incriminating documents and spoliation of evidence regarding sexual abuse by clergy;
> • Transferring sex offending clergy to The Church facilities in other locations where their pasts would not be known to parishoners, and the abusers would have a "fresh start" with a new group of vulnerable children;
> • Threatening and coercing victims and their families to withdraw complaints and retract allegations of sexual abuse;
> • Paying "hush money" to victims and their families, in exchange for promises of non-disclosure and confidentiality.

With specific regard to the Diocese, Mr. Redwing's complaint alleges that

> At the time that Mr. Redwing was abused by Father Guthrie, Mr. Redwing and/or his family were unaware of the Diocese's knowledge of Father Guthrie's sexual interest in young boys. In fact, Mr. Redwing and/or his family were misled

by the Diocese with regard to the Diocese's knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors.

After finding out about Father Guthrie's abuse of minors, the Diocese actively took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits.

These allegations differentiate Mr. Redwing's complaint from the complaints apparently filed in *C.S. v. Diocese of Nashville* and *Doe v. Catholic Bishop for Diocese of Memphis*. Mr. Redwing's complaint contains allegations that both the Roman Catholic Church and the Diocese knew, but covered up, the clergy's sexual abuse of minors and that the Diocese was aware that Fr. Guthrie sexually abused minors *and* misled Mr. Redwing and his family about its knowledge and involvement. Considered in the light most favorable to Mr. Redwing, the allegation that the Diocese misled Mr. Redwing and his family could be construed to mean that at some point, Mr. Redwing or his family asked the Diocese about its knowledge of Fr. Guthrie's conduct and that the Diocese's response misled them. The Court of Appeals has correctly recognized that this circumstance could amount to fraudulent concealment. *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d at 730 (stating that "[h]ad the Diocese been asked about [the priest's] prior offenses in 1987, we cannot know whether the Diocese would have been forthcoming in response to such inquiries. As in *Cevenini*,[37] had [the plaintiff] requested such information and been refused, 'our decision might be different.'").

For the purposes of both the discovery rule and the doctrine of fraudulent concealment, the pivotal issue is whether Mr. Redwing would have discovered the Diocese's allegedly wrongful acts had he exercised reasonable care and diligence. *See Sherrill v. Souder*, 325 S.W.3d at 595; *In re Estate of Davis*, 308 S.W.3d at 842; *Teeters v. Currey*, 518 S.W.2d at 516-17. We must, at least at this juncture, take the allegations in Mr. Redwing's complaint as true and draw all reasonable inferences in Mr. Redwing's favor.

---

[37]In its rejection of a sexual abuse victim's fraudulent concealment claim, the District of Columbia Court of Appeals stated that "[h]ad appellants requested information about [the priest's] background from the Archdiocese and been refused access to it, our decision might be different. However, we are unwilling to hold that a failure to disclose information that has not even been requested constitutes fraudulent concealment." *Cevenini v. Archbishop of Washington*, 707 A.2d at 774. The court also noted that "[m]erely talking to priests and nuns . . . can hardly be deemed a sufficient effort" and that "[d]ue diligence would have required [the plaintiff] to seek out an Archdiocesan official." *Cevenini v. Archbishop of Washington*, 707 A.2d at 774.

Mr. Redwing is arguing, in essence, that the Diocese actively concealed its involvement and that he had no reason to suspect that the Diocese was misleading him. Accordingly, he insists that his inquiry of the Diocese itself was sufficient to constitute reasonable diligence and that he was not required to file suit first and then engage in formal discovery.

The issue of whether Mr. Redwing exercised reasonable diligence to discover his claims against the Diocese is a question of fact. *See Sherrill v. Souder*, 325 S.W.3d at 596 (quoting *Shadrick v. Coker*, 963 S.W.2d at 737). At this stage of the proceeding, the facts are limited to the allegations in Mr. Redwing's amended complaint. The allegations involving the Diocese's active concealment of its knowledge of Fr. Guthrie's activities and its efforts to mislead Mr. Redwing could, if proven, provide a basis for a reasonable fact-finder to conclude that Mr. Redwing, lacking any basis for suspecting that the Diocese would deceive him, acted with reasonable diligence and, therefore, that he should not be held to have known that the Diocese's conduct caused him injury. They could also provide a basis for a reasonable fact-finder to conclude that the Diocese fraudulently concealed its knowledge of and responsibility for Fr. Guthrie's conduct, thereby tolling the statute of limitations.

Ultimately, the decisions regarding the Diocese's alleged fraudulent concealment of its knowledge of and responsibility for Fr. Guthrie's conduct and Mr. Redwing's diligence in pursuing his claim against the Diocese will require further development of the facts through discovery. The current record contains no information regarding (1) when and how Mr. Redwing or his parents asked the Diocese about its knowledge of Fr. Guthrie's conduct, (2) the manner in which the Diocese misled Mr. Redwing or his parents, (3) the steps Mr. Redwing took to pursue claims against Fr. Guthrie prior to Fr. Guthrie's death, (4) when and under what circumstances Mr. Redwing learned or should have learned about the public accounts of the charges that the Roman Catholic Church was engaged in a systematic cover-up of its knowledge of and responsibility for the acts of child abuse committed by its priests, and (5) when and under what circumstances Mr. Redwing learned or should have learned that the Diocese was engaging in the same conduct allegedly engaged in by the Roman Catholic Church.

Because the Diocese has made out a prima facie statute of limitations defense, the burden is on Mr. Redwing to demonstrate that his claims against the Diocese should not be time-barred. Our denial of the Diocese's motion to dismiss does not prevent the Diocese from continuing to assert its statute of limitations defense or to again pursue this defense by motion or otherwise once all the relevant facts are known. However, at this stage of the proceeding, we find that the Court of Appeals erred by dismissing Mr. Redwing's complaint based on the running of the statute of limitations.

# V.

For the reasons discussed above, we conclude that the Court of Appeals correctly determined that the trial court has subject matter jurisdiction over Mr. Redwing's negligent supervision claims against the Diocese but that the Court of Appeals erred by holding that the trial court lacked subject matter jurisdiction over Mr. Redwing's negligent hiring and retention claims. Additionally, we find that the trial court has subject matter jurisdiction over Mr. Redwing's breach of fiduciary duty claim but caution that Mr. Redwing may not proceed with this claim if it is based solely on duties that are either religious or inextricably intertwined with religious duties. We also conclude that the Court of Appeals erred by finding that the statute of limitations barred Mr. Redwing's negligent hiring, retention, and supervision claims against the Diocese. We remand this case to the trial court for further proceedings consistent with this opinion. We also tax the costs of this appeal to the Diocese of Memphis for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE