IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2018 Session

# LAXMI HOSPITALITY GROUP, LLC v. RAJESH NARAYAN

**Appeal from the Chancery Court for Davidson County**
**No. 14-1505-I      Claudia Bonnyman, Chancellor**

_____

**No. M2018-00450-COA-R3-CV**
_____

A company that loaned $100,000 to two individuals filed a complaint to collect the amount due. One defendant filed for bankruptcy, and his debt to the company was discharged. The other defendant asserted that the complaint was barred by the statute of limitations. The company argued that the remaining defendant was equitably estopped from relying on the statute of limitations because he had misled the company to delay filing suit by promising to pay the debt without the need for litigation. The trial court agreed with the company and ruled that the statute of limitations did not bar the company's claim. We affirm the trial court's judgment on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed,**
**as Modified and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Keith Cameron Dennen and Brittany Lind Davis, Nashville, Tennessee, for the appellant, Rajesh Narayan.

Jordan Blake Osborn, Dickson, Tennessee, for the appellee, Laxmi Hospitality Group, LLC.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Laxmi Hospitality Group, LLC ("Laxmi") made a loan of $100,000 to Rajesh Narayan and Kanti Raman. Mr. Narayan signed a promissory note for this amount as "maker" on March 23, 2006, and his signature was notarized the same day. Mr. Raman signed an identical promissory note, also as "maker," on or about May 22, 2006. The

note Mr. Raman signed was not dated, but Mr. Raman's signature was notarized on May 22, 2006. The loan proceeds were remitted by a check issued on May 23, 2006, payable jointly to Mr. Narayan and Mr. Raman.

The terms of the promissory notes required Mr. Narayan and Mr. Raman to repay the note "12 months from the execution date" and to pay "interest at Eleven Percent (11%) per annum." The interest payments were due "quarterly from the date of execution of this promissory note." The notes included the following language:

> This Note is given pursuant to a loan of $100,000.00 cash from Laxmi Hospitality Group LLC and Mike Kisan,[1] to Rajesh Narayan and Kanti Raman and is subject to the rights and obligations of the parties thereto and can be recalled by the Payee at any time prior to terms with a 30 days written notice. As collateral security for the payment of this Note, the Makers have granted payee a security interest in the assets owned by Rajesh Narayan and Kanti Raman.

Interest payments totaling $41,008 were made in August 2006, July 2007, December 2007, November 2008, and October 2009. No payments were made after October 2009. Laxmi filed suit against Mr. Narayan and Mr. Raman on October 22, 2014. Mr. Raman filed a petition for bankruptcy that same month, and Laxmi was precluded by the automatic stay from continuing to proceed against Mr. Raman. Mr. Narayan filed a motion to dismiss Laxmi's complaint in December 2017, contending that Laxmi's claim was barred by the six-year statute of limitations governing contracts. According to Mr. Narayan, the six-year statute of limitations expired on March 23, 2013, over a year before Laxmi filed its complaint against him. Mr. Narayan also argued that Laxmi's claim should be dismissed because the promissory note lacked consideration. Mr. Narayan contended that he did not sign the note that Mr. Raman signed and that Mr. Raman deposited the check into his own account, using the entirety of the proceeds himself without transferring any portion to Mr. Narayan.

Laxmi responded to Mr. Narayan's motion to dismiss, arguing that Mr. Narayan should be estopped from asserting a statute of limitations defense because Mr. Narayan's conduct led Laxmi to refrain from filing suit until after the statute of limitations had run. Laxmi further argued that the court should reject Mr. Narayan's argument regarding lack of consideration because the check for $100,000 was made payable to both Mr. Raman and Mr. Narayan, the check cleared Laxmi's bank, and both Mr. Raman and Mr. Narayan promised to repay the full amount of the loan. Laxmi sought permission to file an amended complaint to support its claim for equitable estoppel. The trial court denied Mr. Narayan's motion to dismiss and granted Laxmi leave to file an amended complaint in

---

[1]The trial court found, and the parties do not dispute, that Mr. Kisan assigned all of his interest in the note to Laxmi.

February 2015.  The parties engaged in discovery and Mr. Narayan filed a motion for summary judgment in April 2016, which the trial court denied in June 2016.

Witnesses' Testimony at Trial

The parties tried their case on December 12, 2017.  The witnesses included Mahesh Kisan[2] on behalf of Laxmi, Mr. Narayan, and Mr. Raman.  Mr. Kisan explained that Mr. Narayan initially contacted him in March or April 2006 and requested a loan for his own use.  Later, when Mr. Kisan told Mr. Narayan he would have to sign a promissory note before receiving any money, Mr. Narayan told Mr. Kisan that he was planning to work on a hotel project with Kanti Raman in Texas and that Mr. Raman would be overseeing the project.  Mr. Narayan asked Mr. Kisan to give Mr. Raman the loan directly, which Mr. Kisan declined to do.  Mr. Kisan testified:

> I said, "Well, I told you I was going to give you the loan.  This is for you, Raj.  So I'm going to give you the money.  It's up to you who you invest it with or what you do with it" - - I mean, - - "who your partner is going to be."

Mr. Kisan explained that Mr. Narayan asked if Mr. Kisan could add Mr. Raman to the promissory note:

> I'm like, "Yes, I can.  It's even better for me, more than one guarantor."  So then we created another note, but [Mr. Narayan] wanted the money.  I said, "As soon as you bring me the promissory note - - you need the money pretty quickly.  Here is - - obviously, Kanti is in Texas, so there's two notes.  You sign one and you mail one to Kanti, but as soon as you bring me yours, I will issue a check to you."

Mr. Kisan confirmed that he intended to make one loan to Mr. Raman and Mr. Narayan together and that he created two identical promissory notes to make it easier for the recipients, who were in different places, to sign the notes and have their signatures notarized.  Once Mr. Narayan returned his signed and notarized note to Mr. Kisan, Mr. Kisan issued the $100,000 check to Mr. Narayan.  Mr. Kisan made the check payable to both Mr. Narayan and Mr. Raman, as Mr. Narayan requested.  Mr. Kisan testified that he handed the check to Mr. Narayan before he received the signed and notarized promissory note back from Mr. Raman.

In response to questions about conversations Mr. Kisan had with Mr. Narayan or Mr. Raman about the status of the loan, Mr. Kisan testified:

---

[2]Mr. Kisan explained that his name is "Mahesh" but that he is known as "Mike."

I see Raj quite a bit. And while the interest payments were being made, although sometimes they were late, but it showed me that they would make the interest payments. And they would - - he was telling me that they cannot pay the loan right now; they would make the interest payments, because I think they were seeking some sort of financing in Texas which wasn't coming through, so it was taking a lot longer. So they kept saying, "Well, we're going to make the interest payment. Can you not give us more time to pay off the balance?"

Mr. Kisan explained that he saw Mr. Narayan about once a week because they had friends in common and would get together at the Indian community center or at someone's house to cook. Mr. Kisan testified that he discussed the payment of the loan with Mr. Narayan starting in 2007 or 2008. Mr. Kisan did not see Mr. Raman often because Mr. Raman was in Texas.

Mr. Kisan sent Mr. Raman a letter dated July 21, 2008, which stated: "This letter is just a reminder, that the PROMISSORY NOTE, dated the 23rd of March, 2006, will become due and payable in full on September 23rd, 2008. I deeply regret that Laxmi Hospitality Group, LLC can not extend credit any longer." After Mr. Kisan sent this letter to Mr. Raman, Mr. Narayan and Mr. Raman told him that they needed more time to work out their financing. Mr. Kisan then received a handwritten note from Mr. Raman dated September 20, 2008, in which Mr. Raman acknowledged the promissory note was coming due in three days' time, on September 23, 2008. Mr. Raman asked Mr. Kisan for "an extension first time, payable before Jan. 25, 2009."

Mr. Kisan testified that Laxmi agreed to extend the loan repayment deadline. He explained:

At that time, the economy was turning so fast and the banks were closing, so it wasn't too prudent to make too much of a demand. We were, like, "We understand what's happening. Try to be good on it, if you could make interest payments, at least, you know. We'll wait."

One of Laxmi's attorneys sent a demand letter to Mr. Narayan and Mr. Raman dated May 26, 2009. In the letter, Mr. Narayan and Mr. Raman were "directed to pay the balance of the loan, with accrued interest, directly to this firm no later than Monday, July 27, 2009." After receiving this letter, Mr. Kisan testified, Mr. Narayan and Mr. Raman telephoned and said, "Look, we got your letter from the attorney . . . Mike, what do you want us to do? I mean, if you're going to file suit, it's still going to - - just give us some more time." Mr. Kisan explained that "the economy was really turning" at that time, so he told Mr. Narayan and Mr. Raman that Laxmi would "hold off and try to work things out." After speaking with Mr. Narayan and Mr. Raman, Mr. Kisan told Laxmi's attorney to "hold off on [filing] the [law]suit."

The last interest payment was made in October 2009.  Mr. Kisan testified that he continued to see Mr. Narayan often in the community following this final payment, and Mr. Narayan continued to ask Mr. Kisan for more time to pay off the loan.  Mr. Kisan testified that he continued making demands on Mr. Narayan and Mr. Raman to repay the loan following the demand letter that Laxmi's attorney sent in July 2009.  By 2011, the economy was improving, and Mr. Kisan said to Mr. Narayan and Mr. Raman, "Look, guys, you really need to do something.  I've given you enough time now."  Mr. Kisan continued to see Mr. Narayan socially but not as often as before.  Mr. Kisan said he saw Mr. Narayan at the community hall or at functions sometimes once a month and sometimes once every few months.

Mr. Narayan and Mr. Raman told Mr. Kisan that Mr. Raman owned some land in India that he could sell or transfer to Mr. Kisan to satisfy their debt in full or in part.  Mr. Kisan testified that Mr. Narayan told him the following:

> Kanti has got some debt over there, too, he needs to pay.  I'm going to go over there.  We'll sell some land.  We'll transfer it or whatever we need to do to keep you happy and try to get some of this loan or most of it paid back to you.  So instead of you staying here, just come to India.  We're both going to be there.

Mr. Kisan agreed with this suggestion and took his family with him to India in mid-December 2011, where they stayed until mid-January 2012.  While he was there, Mr. Kisan met with Mr. Narayan and Mr. Raman in the village of Vihan, where both Mr. Narayan and Mr. Raman had grown up.  Mr. Kisan later learned that Mr. Raman had sold some of his land in India, but that he used the proceeds to pay another debt and did not give any of the proceeds to Mr. Kisan to pay down the loan from Laxmi.

Mr. Kisan testified that the next time he spoke with Mr. Narayan after returning from India was at a Super Bowl party in February 2012.  Mr. Kisan said that he saw Mr. Narayan and called Mr. Raman in Texas and said, "Hey guys, what's going on?"  Mr. Narayan and Mr. Raman told Mr. Kisan that the land in India was worth something, and they asked Mr. Kisan once again to give them more time to satisfy their debt.  Mr. Kisan testified that these types of communications continued through 2013 and 2014 and that Mr. Narayan and Mr. Raman continued to promise Mr. Kisan they would repay the loan if Mr. Kisan could just give them more time.

After Laxmi filed the complaint in October 2014, Mr. Narayan contacted Mr. Kisan and asked him once again to "hold off" on getting a judgment against him.  Mr. Kisan contacted Laxmi's attorney, and the attorney wrote a letter to Mr. Narayan dated November 20, 2014.  In the letter, Laxmi's attorney wrote, in pertinent part:

As you are aware, I represent Laxmi Hospitality Group, LLC . . . . My client has advised that you have not yet filed a responsive pleading in this matter because attempts are currently being made to resolve the dispute.

Based on the current efforts to resolve this matter amicably, I will refrain from filing a motion for default judgment at this time. However, if my client advises that the dispute has not been timely resolved, I will proceed with the action which has been filed against you and move for a default judgment.

Mr. Kisan testified that Mr. Narayan came to see him after receiving this letter from Laxmi's attorney. At this meeting, Mr. Narayan took a position that he had not asserted previously. He told Mr. Kisan that Laxmi's loan was given to Mr. Raman, not to Mr. Narayan, and that Mr. Narayan, therefore, did not owe anything on Laxmi's loan. Mr. Narayan also asserted for the first time that he had signed the promissory note as a "witness" rather than as an obligor on the loan.

Mr. Narayan testified next, and he disputed much of Mr. Kisan's testimony. Mr. Narayan said that he has known Mr. Kisan since 1990, when Mr. Narayan moved to Nashville. Mr. Narayan stated that he grew up in the same village in India as Mr. Raman and that he knows Mr. Raman very well. Mr. Narayan was asked about his statement to Mr. Kisan following Laxmi's filing of the complaint that Mr. Narayan signed the promissory note as a witness rather than as an obligor. Mr. Narayan testified as follows:

Q. Were you in the room with Mr. Raman when he signed?

A. No.

Q. So you did not witness his signature.

A. No. Kanti Raman wasn't there.

Q. Okay. Is there any indication anywhere in the body of the document that mentions the word "witness"? And again—I'll put it back up here so you can look it over.

. . . .

 A. I don't see that.

Q. And your signature is at the bottom. What's written right above your signature?

A. It's written "Maker," but when Mike had asked me to sign as a witness and as a friend -- we were good friends -- so I signed it that I was signing as a witness.

Q. And what were you witnessing?

A. The witnessing the promissory note between Mahesh Kisan and Kanti Raman.

Q. Did you witness Kanti Raman's signature?

A. No. That was a promissory note that he was loaning the money, a hundred thousand to Kanti Raman. He said to just sign as a witness, and since we were good friends, I just didn't pay attention and didn't see the "Maker." But he asked me to sign as a witness, and I did that.

When asked what he was witnessing, Mr. Narayan responded;

A. Witnessing about that the hundred thousand dollars that he was loaning to Kanti Raman.

Q. So you were going to witness that he gave a loan to Kanti.

A. Yeah. He was giving it to Kanti Raman. And he told me to sign as a witness because, you know, he knew that I know Kanti also, and we're from the same village.

Q. Did you see him deliver that money?

A. No, I didn't.

Q. Then how did you witness it?

A. Because he was my friend. He said, "I'm loaning money to Kanti."

Mr. Narayan disputed that he had asked Mr. Kisan for a loan. According to Mr. Narayan, the first time he heard anything about the loan was when Mr. Kisan asked him to sign the promissory note as a witness. Mr. Narayan testified:

Q. Just a moment, Mr. Narayan. So you went to Mike's office to sign the document?

A. I've only been when he called me or I just happened to be there that day, and he said he was loaning the money to Kanti Raman. And he asked me, "I want you to sign this document as a witness." And I did sign that.

Q. So you signed it at Mike's office.

A. Mike's office, yes, at the Drake Motel on Murfreesboro Road.

Q. Okay. Who was there?

A. It was Mike, Mike's brother-in-law, and me, I think. The three.

Q. Mike, Mike's brother-in-law, and you.

A. Yes.

Q. Anybody else?

A. I don't remember anybody else.

Q. Okay. And so you left the document with Mike?

A. Yes.

Q. And that was at the Drake Motel?

A. Yes.

Q. So after you signed the note, did you have any more discussions with Mike Kisan regarding the note?

A. I don't know. I don't remember, no.

Q. When was the next time you talked to Mike?

A. I don't remember.

Q. You don't remember when the next time was you spoke with him?

A. (Shakes head.)

Q. Did you speak with him before this lawsuit was filed?

A. Not about this loan. And when we're meeting, I'll come in and we'll say hi, hello, and all that.

Q. Did you call Mike when the lawsuit was filed?

A. After I received the document, yeah, I called him.

Q. Okay. What did you discuss?

A. I said, "I received the document," you know, "What is happening?" And that's the reason I called him. I said, "Why you doing this to me?" And I never knew that he had me sign as a maker on this promissory note. He never told me that I was legally liable or a "Maker" is legally liable and all that. All I had in my mind was I had signed one of the documents as a witness, and as a friend, he asked me to sign that document as [a] witness. And I signed it.

Contrary to Mr. Kisan's testimony, Mr. Narayan denied that he spoke with Mr. Kisan about the loan from the day he signed the promissory note on March 23, 2006, until the day in 2014 when Mr. Narayan went to see Mr. Kisan in his office to tell him Mr. Narayan had signed the note only as a witness.

Q. [B]etween the date you signed this document, Exhibit 2, and the date when you got served with the complaint, did you have any conversations with Mr. Kisan about the loan he had made to Kanti Raman?

A. Well, I don't think so, because, you know, it wasn't important to me.

Mr. Narayan also denied meeting up with Mr. Kisan in India at the end of 2011 or beginning of 2012. Mr. Narayan testified that he saw Mr. Raman while he was in India, but he denied seeing Mr. Kisan there. Finally, in contrast to Mr. Kisan's testimony, Mr. Narayan denied seeing Mr. Kisan and discussing the loan at a Super Bowl party in February 2012.

Mr. Raman testified last, and his testimony also contradicted that given by Mr. Kisan. Mr. Raman testified that he asked Mr. Kisan directly for the loan of $100,000 and that Laxmi mailed the check to him. Mr. Raman confirmed that the check cleared the bank and that he received the benefit of the proceeds. He denied that Mr. Narayan was involved with the loan at all, he denied discussing the loan with Mr. Narayan, and he denied that Mr. Narayan delivered the check to him. Moreover, Mr. Raman testified that he received the check before he signed the promissory note. He denied that he had been involved in any joint ventures, partnerships, or other business dealings with Mr. Narayan on any projects in Texas, which also contradicted Mr. Kisan's testimony. Mr. Raman

confirmed that he met with Mr. Kisan in India at the end of December 2011 or the beginning of January 2012 to discuss selling some of his family's land to pay Mr. Kisan the money he owed him, but he denied meeting with both Mr. Kisan and Mr. Narayan in India.

## Trial Court's Decision

The trial court issued a ruling from the bench on December 12, 2017, immediately following the presentation of evidence, and it filed its Order and Judgment on February 15, 2018. In its written order, the trial court concluded that Mr. Narayan executed a promissory note to Laxmi that was supported by consideration and that any verbal agreements between the parties regarding Mr. Narayan's obligation to pay were separate and contemporaneous oral agreements that constituted inadmissible parol evidence. As such, any oral statements could not alter or vary the terms of the promissory note. The court found that Mr. Narayan was equitably estopped from asserting the statute of limitations defense to Laxmi's breach of contract claim due to Mr. Narayan's promises and communications to Laxmi regarding payment. The trial court awarded Laxmi a judgment of $210,050.94 against Mr. Narayan that included interest and an award of attorney's fees.

The trial court made findings of fact in its bench ruling and incorporated these findings by reference into its written order. Noting the discrepancy in the witnesses' testimonies, the court found that Mr. Kisan was a credible witness. Based on Mr. Kisan's testimony, the court found that Mr. Narayan sought to borrow $100,000 from Laxmi in 2006 for both himself and Mr. Raman and that Mr. Kisan "evidence[d] the debt in two duplicate promissory notes" because Mr. Narayan was in Nashville, whereas Mr. Raman was in Texas. The court "credit[ed] Mr. Kisan's testimony that he gave the check . . . to the defendant, Narayan" and that a short time later he received back from Mr. Raman the duplicate note signed by Mr. Raman. The court found "[t]he plaintiff's explanations about how the loan was managed and the note signed were entirely credible . . . ."

With regard to the interactions between Mr. Kisan and Mr. Narayan between the date the loan was made and the date the lawsuit was initiated, the court wrote:

> Across these months and years, Mr. Kisan and Narayan often spent time together socially in Nashville. This is not disputed. The plaintiff described their interactions as some social and some loan-related business conversations. In each conversation, Mr. Narayan assured the plaintiff that the note would be paid as soon as the economy improved. In 2007, 2008, and 2009 Mr. Narayan asked the plaintiff to forbear from collecting the note, given the Great Recession.

In July 2008, the plaintiff sent a rare written communication about the debt to Mr. Raman only, saying that the due date on the note would not be extended. In May 2009, the plaintiff's lawyer for the plaintiff wrote both makers of the note that they are more than two years overdue in their obligations to the plaintiff under the notes.

The men were directed to pay all balance and charges, including 11 percent interest by July 2009. This was not accomplished but interest was again paid in October of 2009. The Court finds that in exchange for the interest payment on that date, the plaintiff agreed to forbear in the collection of the debt on a temporary basis. The plaintiff explained that he felt the defendant, Mr. Narayan, would eventually pay the note, because he said he would do so if given more time. It was difficult to get financing to repay anything when the economy was so poor.

In 2011 Mr. Narayan suggested travel to India where it was possible that Mr. Raman could sell some family land and pay the note. The plaintiff had hopes that money would be raised or that he could use the land as security for the note. And consequently, the plaintiff made the trip, returning in January 2012, after almost a month in India.

The plaintiff next saw Mr. Narayan at a Super Bowl party in February 2012 when Mr. Narayan asked for more time to pay the note, saying that the note must be paid or he and Mr. Raman would look bad in the community.

The plaintiff filed the Chancery lawsuit in October 2014, the same month that Mr. Raman filed for bankruptcy status. In November of 2014, however, the plaintiff's trial counsel wrote Mr. Narayan that although an answer was due, "the plaintiff says you're making attempts to resolve the dispute." The lawyer further wrote, "Based on current efforts to resolve the matter amicably, I will refrain from filing a motion for default judgment at this time."

The Court finds that Mr. Narayan and the plaintiff did negotiate extensions of the note payment from July 2007, when the first interest payments were made, through 2009, when the last interest payment was made in the amount of $11,000. Although it may be unusual for a holder of a note to retreat from collection of the debt, it does not seem unreasonable between close friends who see each other frequently. Further, the $11,000 was a plus, providing proof that the two men could carry out their promise to pay, just down the road.

In 2014, after the lawsuit was filed, Mr. Narayan met with the plaintiff and friends of both. It was at this time, after the lawsuit was commenced, that Mr. Narayan, for the first time, told the plaintiff that he signed the note as a witness only and never intended to pay the debt himself, but would look to Mr. Raman to pay, and that the plaintiff must also look to Mr. Raman to pay.

The trial court acknowledged Mr. Narayan's argument that Mr. Kisan failed to memorialize their communications in writing, stating the same was true for Mr. Narayan, "who could have explained to the plaintiff in writing that he was not a maker on the note, in spite of the face of the note to the contrary." The court continued:

Had Mr. Narayan revealed to the plaintiff in a writing or otherwise that he never intended to pay the note, the plaintiff would have known there was no reason to extend the time to pay. Instead, Mr. Narayan regularly asked that the plaintiff extend the time for he and Mr. Raman to pay the note. This conduct was misleading and unfair.

Citing Tenn. Code Ann. § 47-3-303, the court found that Mr. Narayan received consideration in exchange for his promissory note. The court found that the lending party, Laxmi, provided the consideration necessary to support the promissory note when Mr. Kisan transferred the $100,000 check to Mr. Narayan. The court then turned to Mr. Narayan's contention that he was only a witness to the loan to Mr. Raman rather than an obligor on the loan. Relying on the parol evidence rule, the court explained that a written contract prevails over a previous or contemporaneous contradictory representation, concluding that "the oral comments that Mr. Narayan said took place are not admissible to vary [the] terms of the promissory note."

In response to Mr. Narayan's claim that Laxmi's claim was barred by the six-year statute of limitations, the court explained that "[t]he doctrine of equitable estoppel tolls the running of the statute of limitations when the defendant has misled the plaintiff into failing to file suit within the necessary limitations period" when "[t]he defendant's conduct is sufficiently unfair and misleading to outweigh the public policy favoring the enforcement of the statute of limitations." Applying the law to the facts of the case, the court found that if Mr. Narayan had not promised to pay the debt and if he had not persuaded Laxmi to delay filing its lawsuit, Laxmi would have filed its complaint within the six-year statute of limitations. The court wrote:

The Court finds here that had the defendant come forward to state that he always intended to serve as a witness only and never intended to pay any note himself, then the plaintiff would have known that it had every reason to go ahead and file suit, because things weren't going to change and the payment was not going to be made by Mr. Narayan.

- 12 -

Mr. Narayan did not take that approach, however. And the plaintiff was advised, for the first time after the lawsuit was filed, that the defendant, Mr. Narayan, never intended to pay under the note, and so the Court is finding here that the defendant is collaterally -- is equitably estopped to use the defense of the statute of limitations because of his misconduct in misleading the plaintiff into delaying filing his cause of action in an unfair way, especially given the fact that these parties were friends and trusted each other.

Mr. Narayan appeals the trial court's judgment. On appeal he contends that (1) the six-year statute of limitations bars Laxmi's action and that the trial court erred by ruling that Mr. Narayan was equitably estopped from relying on the statute of limitations as a defense because Mr. Kisan failed to show he relied on Mr. Narayan's promises to pay the debt; (2) there was a lack of consideration because the $100,000 check went to Mr. Raman and not to him; (3) the trial court erred by admitting and considering parol evidence offered by Mr. Kisan that the two promissory notes constituted one debt rather than two debts; (4) there were two promissory notes, not just one, and he should not be liable for the debt Mr. Raman incurred because Mr. Narayan did not sign the promissory note that Mr. Raman signed; and (5) the trial court awarded a post-judgment interest rate that was higher than the maximum rate permitted under Tennessee law.

## II. ANALYSIS

We review a trial court's findings of fact de novo upon the record, according the trial court a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Curry v. City of Hohenwald*, 223 S.W.3d 289, 291 (Tenn. Ct. App. 2007). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Phillips v. A&H Constr. Co., Inc.*, 134 S.W.3d 145, 149 (Tenn. 2004). When the testimony of witnesses is inconsistent, appellate courts "afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). Appellate courts refrain from reevaluating a trial court's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

It is clear from the testimony summarized and quoted above that Mr. Kisan's testimony was inconsistent with much of Mr. Narayan's and Mr. Raman's testimony. The trial court found Mr. Kisan credible, and Mr. Narayan does not present clear and convincing evidence to the contrary suggesting that we should reevaluate the trial court's

assessment of Mr. Kisan's credibility. Thus, we will consider the facts of this case to be as the trial court determined.

### 1. Statute of Limitations and Equitable Estoppel

Mr. Narayan is correct that the statute of limitations for enforcing an obligor's payment on a promissory note is normally six years from the due date of the note. Tenn. Code Ann. § 47-3-118(a). The evidence showed that Mr. Narayan signed the promissory note at issue in March 2006, Mr. Raman signed the note as late as May 2006, and the debt was due to be repaid twelve months later. Thus, in the absence of any equitable bases for tolling the statute of limitations, Laxmi would have had until March or May 2013 to file its complaint.[3] However, "the doctrine of equitable estoppel tolls the running of the statute of limitations when the defendant has misled the plaintiff into failing to file suit within the statutory limitations period." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012).

As the party asserting the equitable estoppel doctrine, Laxmi has the burden of proving the statute of limitations should be tolled in this case. *Id.* (citing *Hardcastle v. Harris*, 170 S.W.3d 67, 85 (Tenn. Ct. App. 2004)).

> [W]henever a defendant has made out a prima facie statute of limitations defense, the plaintiff must demonstrate that the defendant induced him or her to put off filing suit by identifying specific promises, inducements, suggestions, representations, assurances, or other similar conduct by the defendant that the defendant knew, or reasonably should have known, would induce the plaintiff to delay filing suit. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d [141,] 145 [(Tenn. 2001)]; *Hardcastle v. Harris*, 170 S.W.3d at 85. The plaintiff "must also demonstrate that [his or her] delay in filing suit was not attributable to [his or her] own lack of diligence." *Hardcastle v. Harris*, 170 S.W.3d at 85.

*Id.* Equitable estoppel is only available when the defendant engages in some sort of misconduct. *Id.* Courts have applied the doctrine in situations where (1) a defendant has promised not to assert a statute of limitations defense, (2) a defendant has promised to pay the plaintiff's claim without requiring the plaintiff to initiate litigation, and (3) a defendant has promised to settle a plaintiff's claim once another action between the defendant and a third party is resolved. *Id.* at 460-61.

Laxmi contends that the second scenario applies here—that Mr. Narayan promised to pay his debt to Laxmi without requiring Laxmi to file a lawsuit. To satisfy its burden of proof, a plaintiff must show that the defendant misled the plaintiff. *Id.* at 461. A

---

[3]Laxmi did not initiate this action until October 22, 2014.

plaintiff "must identify specific promises, inducements, representations, or assurances by the defendant that reasonably induced the plaintiff to delay filing suit." *Hardcastle*, 170 S.W.3d at 85. "Vague statements or ambiguous behavior" is not enough. *Id*. "Actual fraud, bad faith, or intent to mislead or deceive on the part of the defendant is not necessary," however, before a plaintiff may invoke the doctrine. *Id*. The defendant's conduct and the plaintiff's reasonable reliance on that conduct are key in determining whether the plaintiff is entitled to rely on the equitable estoppel doctrine. *Redwing*, 363 S.W.3d at 461. The plaintiff must show that its own lack of diligence was not the cause of the delay. *Hardcastle*, 170 S.W.3d at 85.

As the *Redwing* Court explained,

Determining whether to invoke the doctrine of equitable estoppel to counter a statute of limitations defense requires the courts to examine the facts and circumstances of the case to determine whether the defendant's conduct is sufficiently unfair or misleading to outweigh the public policy favoring the enforcement of statutes of limitations.

*Redwing*, 363 S.W.3d at 461 (citing *Hardcastle*, 170 S.W.3d at 85). "The statute of limitations is tolled for the period during which the defendant misled the plaintiff." *Id.* (citing *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001), and *Lusk v. Consol. Aluminum Corp.*, 655 S.W.2d 917, 920-21 (Tenn. 1983)). Once the plaintiff knows, or should know, that the defendant has misled it, "the original statute of limitations begins to run anew, and the plaintiff must file [its] claim within the statutory limitations period." *Id.* (citing *Fahrner*, 48 S.W.3d at 146); *see also Kesterson v. Jones*, No. E2013-02092-COA-R3-CV, 2015 WL 2445968, at *3 (Tenn. Ct. App. May 21, 2015) (affirming *Redwing*'s ruling that statute of limitations "begins to run anew" under equitable estoppel doctrine when plaintiff knows or should know that defendant has misled him/her/it). The *Fahrner* Court explained the reason for this rule:

Equitable estoppel is premised on the defendant's wrongdoing, and, consequently, the plaintiff must be given the time during which the defendant misled the plaintiff so that plaintiff's entitlement to the full statutory time period is preserved. . . . Any other result would reward the defendant for his deception.

*Fahrner*, 48 S.W.3d at 146.

In the case at bar, Mr. Kisan described how Mr. Narayan and Mr. Raman promised to pay their debt and asked Laxmi to give them more time in which to pay. The debt was originally due one year after the notes were executed, which would have been March or May 2007. Mr. Kisan saw Mr. Narayan every week or so during that time period, and Mr. Kisan testified that Mr. Narayan continually asked for an extension to pay the note

because the economy was so bad. Mr. Kisan agreed, and he extended the date of payment to September 23, 2008. This agreement by Mr. Kisan, on behalf of Laxmi, is evidenced by the letter introduced at trial from Mr. Kisan to Mr. Raman dated July 21, 2008. Mr. Raman then asked for a further extension to January 25, 2009.

Mr. Kisan testified that whenever he saw Mr. Narayan, he asked about the payment that was due, and Mr. Narayan always promised that he and Mr. Raman would pay it but that they just needed more time. One of Laxmi's attorneys sent Mr. Raman and Mr. Narayan a demand letter in May 2009. Mr. Kisan testified that Mr. Raman and Mr. Narayan responded to this letter by asking again for Laxmi to delay filing suit to give them more time to pay their debt.

Mr. Kisan testified that he was growing more impatient with Mr. Narayan and Mr. Raman by 2011 because the economy had improved somewhat by then, and he told them, "Look, guys, you really need to do something. I've given you enough time now." Mr. Narayan's and Mr. Raman's response was to suggest that Mr. Kisan travel to India with them over the winter holiday because Mr. Raman had some land in India he was hoping to sell. The suggestion was made that proceeds from the sale(s) could go to paying off the note, and if this did not occur, some of the land could be transferred to Mr. Kisan or Laxmi. Based on Mr. Narayan's and Mr. Raman's promises, Mr. Kisan traveled to India. Rather than using the proceeds Mr. Raman received from his land sale(s) to pay his debt to Laxmi, however, Mr. Raman transferred the funds to others to whom he also owed money.

The final interaction that Mr. Kisan described with any specificity that he had with Mr. Narayan and Mr. Raman occurred in February 2012 at a Super Bowl party. Mr. Kisan testified that he saw Mr. Narayan and phoned Mr. Raman and asked, yet again, when they were going to pay their debt to Laxmi. As before, Mr. Narayan and Mr. Raman asked for more time. Mr. Kisan testified that he continued pressing Mr. Narayan and Mr. Raman to pay their debt in 2013 and 2014, and that they continued asking for more time to pay. Mr. Kisan finally filed suit on behalf of Laxmi in October 2014. Even after Laxmi filed its initial complaint, Mr. Narayan and Mr. Raman continued trying to resolve the dispute before filing responsive pleadings.

These facts lead us to conclude that Mr. Narayan engaged in conduct that misled Mr. Kisan into believing he and Mr. Raman would pay their debt without requiring Laxmi to file suit and that this misconduct delayed the filing of Laxmi's complaint until more than six years had passed from the date the debt became due. We find that each time Mr. Kisan pressed Mr. Narayan to pay the amount due, Mr. Narayan assured Mr. Kisan he would pay but that he just needed more time. Given the friendship Mr. Kisan had with Mr. Narayan, we find Mr. Kisan continually delayed filing a lawsuit based on his friend's promise to pay and that he acted reasonably in relying on Mr. Narayan's promises to pay the debt once the economy improved. Mr. Kisan testified with

specificity about Mr. Narayan's assurances to him as late as February 2012 that he would pay the debt to Laxmi if Mr. Kisan would give him more time. Mr. Kisan did not testify about specific conversations he had with Mr. Narayan following February 2012.

According to the Court in *Redwing*, the applicable statute of limitations is tolled throughout the period that the defendant misled the plaintiff and "begins to run anew" at the point "when the plaintiff knows or should know that the defendant has misled [it.]" *Redwing*, 363 S.W.3d at 461; *see also Fahrner*, 48 S.W.3d at 146 ("the tolling period equals the amount of time the defendant misled the plaintiff"). The evidence does not reveal exactly when Mr. Kisan knew or should have known Mr. Narayan was misleading him. However, based on the last specific representation from Mr. Narayan in February 2012 about which Mr. Kisan testified, we find that the six-year statute of limitations began to run anew on that date. Laxmi filed its complaint in October 2014, well within six years from February 2012. As a result, we conclude that Laxmi's filing of its complaint was timely and Mr. Narayan is unable to prevail on his statute of limitations defense. In affirming the trial court's decision that Mr. Narayan is equitably estopped from relying on the statute of limitations as an affirmative defense, we conclude that Mr. Narayan's conduct was "sufficiently unfair or misleading to outweigh the public policy favoring statutes of limitations." *Hardcastle*, 170 S.W.3d at 85.

2. <u>Consideration for the Debt</u>

Mr. Narayan contends he should not be liable for the note because the $100,000 check from Laxmi went to Mr. Raman, not to himself, and that Mr. Raman used the entirety of the proceeds. Thus, Mr. Narayan argues, the contract is unenforceable against him due to a lack of consideration. *See* Tenn. Code Ann. § 47-3-303(b) ("The drawer or maker of an instrument has a defense if the instrument is issued without consideration."). According to Mr. Narayan, "Laxmi presented no evidence of any consideration paid to Mr. Narayan or any value received by Mr. Narayan." We disagree.

Mr. Kisan testified that he handed the $100,000 check to Mr. Narayan after Mr. Narayan delivered to him the promissory note that Mr. Narayan signed and had notarized. A photocopy of the front of the $100,000 check at issue was introduced into evidence at the trial, and this document reveals that the check from Laxmi was written to the order of "Kanti Raman and Rajesh Narayan." Mr. Narayan testified that Mr. Kisan did not hand him the check and that he did not endorse it.[4] However, as discussed above, the trial court found Mr. Kisan's testimony was credible and we are not in a position to second-guess the trial court's assessment of his credibility. After receiving the check from Mr. Kisan, Mr. Narayan was free to do whatever he wanted with it. Because the evidence

---

[4]The record does not include a photocopy of the back of the check, so we cannot determine for ourselves whether or not Mr. Narayan endorsed it.

reveals that the check was made payable to him and was delivered to him, Mr. Narayan cannot prevail on his argument that the note was not supported by consideration.

### 3. Parol Evidence

Mr. Narayan next contends that the two promissory notes reflect two different debts and takes issue with the trial court's consideration of Mr. Kisan's testimony that he issued two promissory notes as part of one loan. Mr. Kisan testified that he made one loan and that he prepared two identical promissory notes in connection with this loan. One note was for Mr. Narayan to sign and the other was for Mr. Raman to sign. Mr. Kisan testified that he created two identical notes because Mr. Narayan seemed to be in a rush to get the money, and Mr. Narayan and Mr. Raman lived in different places. Mr. Kisan believed it would be easier, and quicker, for Mr. Narayan and Mr. Raman to sign identical documents and return them to him directly than it would be for one of them to sign a document, send it around to the other to sign, and then return that document to Mr. Kisan.

The parol evidence rule is established as part of the common law and pursuant to statute in Tennessee. Tennessee Code Annotated section 47-2-202 provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein *may not be contradicted* by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented*:
>
> (a) By course of performance, course of dealing or usage of trade, pursuant to § 47-1-303; and
>
> (b) *By evidence of consistent additional terms* unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

(Emphasis added.) Similarly, Tennessee case law provides that "[u]nder the parol evidence rule parol evidence is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof." *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990). Parol evidence of the parties' understanding regarding a written agreement is admissible if it "does not *contradict or vary terms* which are plainly expressed in the writing." *Id.*; *see also Martin v. King*, No. E2002-03055-COA-R3-CV, 2003 WL 23099677, at *6 (Tenn. Ct. App. Dec. 30, 2003); *Farmers & Merchs. Bank v. Petty*, 664 S.W.2d 77, 81-82 (Tenn. Ct. App. 1983).

Mr. Kisan testified about the reason he created two identical promissory notes. He did not testify about any agreement he had made with Mr. Narayan regarding the preparation thereof. In any event, the testimony Mr. Kisan offered explaining why he created two documents does not contradict or vary the terms of the notes themselves. The notes specifically stated that (1) Laxmi was giving a loan of $100,000 to Mr. Narayan and Mr. Raman and (2) that Mr. Narayan and Mr. Raman promised to pay Laxmi the principal sum of $100,000 twelve months from the execution date of the notes. We conclude that Mr. Kisan's testimony that Laxmi was making one loan, evidenced by two identical promissory notes, is consistent with the terms of the notes and, therefore, cannot constitute inadmissible parol evidence.

### 4. Mr. Narayan's Liability

Mr. Narayan next argues that he should not be held liable on the note that Mr. Raman signed because Mr. Narayan did not sign Mr. Raman's note. As we discussed above, Mr. Narayan was identified as a payee on the check, Mr. Kisan delivered the check to Mr. Narayan, and Laxmi is relying on the document Mr. Narayan executed as "maker" to prove its case. Mr. Narayan's argument that he should not be held liable for the document Mr. Raman signed is not well-taken.

### 5. Interest Rate

Mr. Narayan's final argument is that the trial court erred in directing him to pay a default interest rate of eighteen percent on the judgment awarded. In its written order, the trial court specified different rates of interest that Mr. Narayan was responsible for:

> The Plaintiff is entitled to a monetary judgment in connection with the debt, and the interest on said judgment should be calculated at the rate of eleven percent (11%) from the time of execution of the note until the filing of the lawsuit. From the date of the lawsuit (*i.e.* October 22, 2014) until the date of trial, interest should be calculated at the default interest rate of eighteen percent (18%).

The trial court did not explain how it arrived at a default interest rate of eighteen percent, and Laxmi conceded at oral argument that the trial court may have erred in assessing that rate. The promissory notes specify in the first paragraph that the makers are obligated to pay the principal sum of $100,000 "together with interest at Eleven Percent (11%) per annum," and that the interest payments are due quarterly. The penultimate paragraph provides that if an attorney is retained to enforce the terms of the note, the makers will pay all costs of collection and litigation, including attorney's fees, "and if in default of any kind this note shall bear maximum interest allowed by law." The notes do not specify a default rate of interest. Accordingly, we vacate that part of the trial court's judgment ordering Mr. Narayan to pay interest at the rate of eighteen percent and direct

- 19 -

the trial court, on remand, to calculate the proper rate of interest on the judgment in accordance with Tenn. Code Ann. §§ 47-14-103 and 47-14-121(c).

## III. CONCLUSION

We affirm the trial court's judgment as set forth above and remand the case to the trial court for a determination of the proper amount of post-judgment interest to assess against Mr. Narayan. Costs of the appeal shall be taxed to the appellant, Rajesh Narayan, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE